STATE OF NORTH CAROLINA v. RUSSELL BRICE HINSON

No. 499A94

(Filed 28 July 1995)

**1. Criminal Law § 433 (NCI4th)— closing argument—prosecutor's comments about defendant's character—comments supported by evidence**

Comments made by the prosecutor in his closing argument insinuating that a witness was afraid to testify out of fear of defendant or because defendant had a propensity for violence were not grossly improper and did not require a new trial, since the evidence demonstrated that the actions of defendant were those of a mean and vengeful killer and that he had no hesitation in killing complete strangers just as long as someone "paid."

**Am Jur 2d, Trial §§ 681, 682.**

**Negative characterization or description of defendant, by prosecutor during summation of criminal trial, as ground for reversal, new trial, or mistrial—modern cases. 88 ALR4th 8.**

**2. Criminal Law § 446 (NCI4th)— jurors imagining victim as their child—prosecutor's argument not grossly improper**

In a prosecution of defendant for the murder of a sixteen-year-old girl who was a stranger to him by shooting her with a crossbow and arrow, the prosecutor's argument asking the jurors to imagine the victim as their own child was not so grossly improper that it denied defendant a fair trial in light of the overwhelming evidence that defendant committed a cold, senseless, and calculated first-degree murder against the victim.

**Am Jur 2d, Trial §§ 664 et seq.**

**Propriety and prejudicial effect of prosecutor's remarks as to victim's age, family circumstances, or the like. 50 ALR3d 8.**

**3. Constitutional Law § 309 (NCI4th)— defendant's guilt—no admission by defense counsel in closing argument**

Defendant's counsel did not render ineffective assistance by conceding defendant's guilt of murder without defendant's consent when he stated during closing argument that defendant's driver "was the engine that made everything possible. He is the tool without which [defendant] could not have even gotten out of his yard" where defense counsel maintained throughout the trial that the driver, not defendant, killed the victim, and nowhere in his argument did defense counsel concede that defendant himself committed any crime whatsoever.

**Am Jur 2d, Trial §§ 490 et seq.**

**Adequacy of defense counsel's representation of criminal client regarding argument. 6 ALR4th 16.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Freeman, J., at the 6 December 1993 Criminal Session of Superior Court, Union County. Heard in the Supreme Court 12 May 1995.

*Michael F. Easley, Attorney General, by Valerie B. Spalding, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

STATE v. HINSON

[341 N.C. 66 (1995)]

ORR, Justice.

Defendant was indicted for the 28 December 1992 first-degree murder of Felicia Hope Houston. He was tried capitally at the 6 December 1993 Criminal Session of Superior Court, Union County, and was found guilty as charged. The jury recommended and the judge sentenced defendant to life imprisonment.

Defendant appeals to this Court asserting three assignments of error. We find no error in defendant's assignments and, accordingly, uphold defendant's conviction for murder in the first degree and sentence of life imprisonment.

Evidence presented by the State tended to show the following facts and circumstances. Felicia Houston was a sixteen-year-old high school student. During the Christmas holidays in 1992, she visited with her cousins in Monroe, North Carolina. Felicia's cousin, Cynthia Wilson, age thirteen, testified that at approximately 6:30 p.m. on 28 December 1992, Cynthia, Felicia and Cynthia's sister, Deborah, left their apartment to visit another cousin. As they walked down the sidewalk towards a parking lot, Cynthia observed a parked red truck. Cynthia testified that immediately after observing the truck, she saw a flash of light coming from it and heard a "swishing" sound. Felicia fell to the ground and began screaming that she was hurt. Cynthia momentarily hid behind a tree and observed an arrow sticking in the tree. She then went for help and a neighbor called for an ambulance. By the time Cynthia returned to the victim, a crowd had gathered, and the police had arrived. When an officer turned Felicia over, Cynthia saw an arrow protruding from Felicia's chest.

Cynthia testified that none of the three girls had any kind of weapon with them and none of them had said anything to whoever was in the red truck. Because it was dark, Cynthia could not see inside the red truck.

Padishah Poole testified that on 28 December 1992, he and about four other black males were standing outside near a tree in the area of the Wilsons' apartment complex. Poole testified that he saw a red truck drive by slowly, cruising. During the two- or three-hour period that Poole was standing in the vicinity of the apartment building, the truck drove by four or five times. Poole testified that the truck had a camper top on the back of it. Poole could not see inside the truck because the windows were tinted. As the truck approached the men, Poole heard a noise. Poole and his companions thought someone was

STATE v. HINSON

[341 N.C. 66 (1995)]

shooting with a silencer, so they ran to the back of the apartment building. They could still, however, see the tree from where they were standing.

Poole testified that three or four minutes later, the truck returned. He saw some girls walking towards the tree, and the truck slowed. Then Poole heard one of the girls screaming. Neither Poole nor his companions had said anything to whoever was in the truck prior to the attack on the girls.

Guy Brown testified pursuant to a plea agreement. He had been charged with accessory after the fact of first-degree murder and was sentenced to three years. The terms of the plea agreement specified that if he testified truthfully at defendant's trial, the murder charge would be dropped, and since he had already served eleven months in jail, he would be released from jail.

Brown testified that he had met defendant through defendant's brother and that both he and defendant worked in the same masonry business. On 28 December 1992, Brown first saw defendant at about 4:30 p.m. when defendant came to Brown's trailer. Defendant told Brown that he wanted him to "take him down the road to deliver a message." Defendant said that he and a friend named Chris had been cheated in a drug deal earlier. Defendant did not say what the message was. Brown, who was babysitting his children, told defendant they would have to wait until his wife got home from work so that they could take the truck she was driving, which was a red Chevrolet S-10 with a camper top on the back. Brown testified that his wife arrived home a little after 5:00 p.m. After Brown and his wife talked briefly, defendant and Brown left in Brown's truck and went to McDonald's. Once they reached McDonald's, defendant gave Brown directions to a housing project. Brown testified that he realized then that the housing project was the location in which defendant had mentioned that he and Chris had been cheated when they went to buy drugs. Brown asked defendant if the housing project was the place, and defendant replied that it was. Defendant pointed to the corner of a building where he said he and Chris had gone to buy crack and the seller had run off with $70.00 of Chris' money. Brown testified that he kept driving around the block. Defendant said he wanted to see if the drug dealers were standing outside and that he was looking for one particular "boy." Brown drove around the block some more, but when they could not find the "boy" they were looking for, they drove to a liquor store where defendant bought some liquor. It was then that

STATE v. HINSON

[341 N.C. 66 (1995)]

Brown noticed a crossbow on the passenger side floorboard of the truck. When defendant returned to the truck, Brown asked him whether he was going to deliver the "message" with the crossbow, and defendant said that he was. Brown testified, however, that he did not realize at the time that defendant was actually planning to shoot somebody with it.

Brown testified that the two men then drove to a Fast Fare convenience store where Brown went in and bought ice and soda. After mixing some drinks, defendant suggested that he and Brown go back to the housing project because defendant had not yet delivered his "message." By that time, it was getting dark. This time, defendant directed Brown to drive into the housing project the back way. As they drove by the apartments, defendant, who was on the passenger side, was closest to the apartments. Defendant saw an individual standing outside whom he described as "one of them." He then told Brown to drive back to the McDonald's so that they could finish their drinks.

Brown testified that he drove back to McDonald's where defendant drank some more liquor and got out to use the bathroom. Defendant then said, "Let's go ahead and get this over with." Brown drove back to the apartments. When he and defendant arrived, Brown pulled up to two males because defendant recognized one of them as a drug dealer. Brown further testified that when he stopped the truck, defendant took the crossbow from under his feet and attempted to aim it out of the open passenger window. He further testified that he yelled at the two males, who were standing some distance away. Defendant fired the crossbow, and then Brown drove away. Defendant remarked that he thought he had hit a tree and reloaded the crossbow. Brown replied that he would drive around again so that they could look for the arrow. Brown testified that he and defendant drove around and that defendant said the men would probably shoot at them. Brown replied that they probably would not be there.

When they reached the apartments again, Brown drove slowly but did not stop. Defendant asked Brown to stop; he was looking out of the truck towards the back as if someone was approaching from behind. Brown stopped and leaned over to see who it was. He had seen three girls coming over a rise and had heard them talking. Brown testified that defendant had the crossbow partially out of the passenger window and was aiming it towards them. Brown testified that he told defendant "not to shoot because they were girls," but that

**STATE v. HINSON**

[341 N.C. 66 (1995)]

defendant replied that he "didn't care," stating that "one of them was going to pay." Defendant then fired the crossbow.

Brown testified that he heard one girl scream. As he began to drive away, he heard another, different scream. Defendant said that he thought he had hit one of the girls. Brown testified that he did not try to help the girls because he and defendant were white, were in a black neighborhood, and had shot a girl. He was scared and wanted to get out of the area. Brown and defendant stopped at a gas station to use the bathroom, and defendant bought a pack of cigarettes and a bag of ice. They sat in the truck and mixed some more drinks. Brown then drove home where he and defendant continued to drink liquor and beer in an outbuilding near Brown's house until about 10:00 p.m. Brown drove defendant home in defendant's truck because defendant was too drunk to drive. Defendant's wife drove Brown back to his trailer.

Pam Brown, Brown's wife, testified that Brown told her that

he had taken Russell down there and, um, they drove around and, um, Russell shot an arrow at a tree. He assumed that he hit a tree. And then he drove around another time, and, um, he said Russell threw the crossbow up again and, um, he shot it, and as Mitchell [Guy Brown] was driving off he heard girls screaming.

She further testified that Brown "told Russell not to shoot because there were girls at the end of the street and Russell told him that it didn't matter, that someone was going to pay."

Deborah Radisch, M.D., Associate Chief Medical Examiner of the State of North Carolina, was stipulated to be an expert forensic pathologist, and testified that she performed an autopsy on the victim's body on 30 December 1992. Dr. Radisch opined that the victim died as the result of an arrow wound to her right armpit, which had caused her to bleed to death.

Roger Coan, a detective with Monroe Public Safety, testified that he participated in the investigation into the victim's death. The investigation focused on defendant beginning on 30 December 1992, after a telephone call from a confidential informant. Coan and another officer later interviewed Brown at the jail and took a statement from him. Coan read the statement to the jury, which corroborated Brown's trial testimony in all essential respects.

STATE v. HINSON

[341 N.C. 66 (1995)]

Richard McCoy testified that he had known defendant for ten years and identified defendant in court. McCoy testified that on 28 December 1992, he did not go to work because there was an ice storm and the electricity was off. At about 2:00 p.m., defendant arrived at McCoy's house. At one point, McCoy and defendant went outside because defendant did not want to speak in front of McCoy's family. Defendant told McCoy that "he wanted to deliver a message" because "a nigger had shit on him in a drug deal." McCoy testified that defendant told him that he "had already jumped a nigger at the basketball court and pulled a long knife on him because of the drug ripoff." McCoy asked defendant whether he was just going to "shoot the person in the leg and scare him," to which defendant replied that he was going "to shoot a nigger through the heart." McCoy walked with defendant to his vehicle, where he saw a crossbow and arrow. Defendant took the crossbow out of his vehicle and showed McCoy where he had put oil on the shaft so that no fingerprints would remain. Defendant said that he was going to deliver his "message" in the area behind McDonald's in Monroe. McCoy refused to drive defendant.

McCoy testified that he heard about the victim's death later that night and that a few days afterward, he went to the police. He told the police that he had information which might be pertinent to the crossbow murder, and he gave defendant's name. Finally, he testified that the crossbow he was shown in court was similar to the one defendant had shown him on 28 December 1992.

The defendant presented no evidence.

## I.

Defendant contends that errors made by the trial court with respect to the three issues presented on appeal entitle him to a new trial. As to each of these issues, defendant contends that both his federal and state constitutional rights to a fair trial were violated.

[1] Defendant raises as error two categories of comments made by the prosecution during the closing arguments. At the outset, we note that "[p]rosecutors are granted wide latitude in the scope of their argument." *State v. Zuniga*, 320 N.C. 233, 253, 357 S.E.2d 898, 911, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987), *denial of post-conviction relief rev'd*, 336 N.C. 508, 444 S.E.2d 443 (1994).

"Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together

STATE v. HINSON

[341 N.C. 66 (1995)]

with the relevant law so as to present his or her side of the case. Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court."

*State v. Ward,* 338 N.C. 64, 98, 449 S.E.2d 709, 728 (1994) (quoting *State v. Brown,* 320 N.C. 179, 194, 358 S.E.2d 1, 12-13, *cert. denied,* 484 U.S. 970, 98 L. Ed. 2d 406 (1987)), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3833 (1995).

Defendant did not object to any of the challenged comments at trial. "[O]ur appellate courts may, in the absence of an objection by the defendant, review a prosecutor's argument to determine whether the argument was so grossly improper that the trial court committed reversible error in failing to intervene *ex mero motu* to correct the error." *State v. Williams,* 317 N.C. 474, 482, 346 S.E.2d 405, 410 (1986). In such circumstances, the trial court is not required to intervene unless the arguments " 'stray so far from the bounds of propriety as to impede the defendant's right to a fair trial.' " *State v. Harris,* 308 N.C. 159, 169, 301 S.E.2d 91, 98 (1983) (quoting *State v. Davis,* 305 N.C. 400, 421, 290 S.E.2d 574, 587 (1982)). Moreover, "[o]n appeal, particular prosecutorial arguments are not viewed in an isolated vacuum." *State v. Moseley,* 338 N.C. 1, 50, 449 S.E.2d 412, 442 (1994), *cert. denied,* —— U.S. ——, 131 L. Ed. 2d 738 (1995). "Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they referred." *Id.*

During the trial, State witness McCoy was twice held in contempt for refusing to testify. Commenting on McCoy's alleged reluctance to testify, the prosecutor argued as follows:

Why do you think Mr. McCoy when he testified was so hesitant to testify? If you recall, it took him three times. After calling him a third time he finally testified. Why do you think that was? Is it because that [sic] he was such a good friend of the defendant or was it because of his fear? His fear for his life? He didn't want to get one of these put in his chest, did he? Or right—right above the clavicle as Mr. Bowers said.

Why do you think Mr. McCoy had such a difficult time testifying? Is that not significant to you? Is that not significant at— what does that say about the defendant? What does that really say? No one crosses him. No one crosses the defendant. You just don't do it.

As noted earlier, the defendant failed to object to any of the comments made by the prosecutor which are now assigned as error. The defendant, however, argues that these comments by the prosecutor insinuating that McCoy was afraid to testify out of fear of defendant or because defendant had a propensity for violence were grossly improper and require that he be given a new trial. The State contends that the prosecutor's remarks were proper since they consisted of inferences grounded in the evidence presented at trial. Even if we were to find the State's closing argument improper, after a careful review of the comments in question, we do not believe the claimed error was of such gross impropriety as to warrant intervention by the trial court *ex mero motu*.

The evidence before the jury demonstrated that the actions of defendant were those of a mean and vengeful killer and that he had no hesitation in killing complete strangers just as long as someone "pays." McCoy testified that after the murder, he had not contacted the police for several days and that he told the officer who came out to interview him that he did not want to testify. In addition, McCoy's testimony showed that defendant had planned to send his "message" for at least a day prior to the killing. He had prepared the crossbow and then sought someone other than himself to drive for him so that he would have both hands free to fire the weapon. The State's evidence also showed that defendant was cheated in a drug deal and was determined to seek revenge. The State argues that the obvious inference from this evidence is that defendant would not hesitate to exact revenge on someone he thought had wronged him. We hold that the evidence permitted such an inference.

This assignment of error is overruled.

## II.

[2] Next, defendant contends that the trial court erred in permitting the prosecutor to ask jurors to imagine the victim as their own child. Specifically, defendant challenges the following comments:

> She didn't die right away, did she? She didn't die right away. She was shot at six thirty, she died the next morning at what, ten thirty. Can you imagine? What if this had been your daughter? What if this had been your child? Can you imagine anything worse?

Defendant contends that he was prejudiced because this portion of the prosecutor's argument "inject[ed] a highly emotional source of

bias into the jury's deliberations which distorted the jury's considera-
tion of the evidence"; therefore, he is entitled to a new trial. The State
argues that the prosecutor was illustrating to the jurors that the State
had circumstantially proven defendant's premeditation and delibera-
tion prior to murdering the victim by, among other factors, evidence
that the killing was done in a brutal manner. *State v. Olson*, 330 N.C.
557, 565, 411 S.E.2d 592, 596 (1992) (where this Court lists seven cir-
cumstances which are used to imply premeditation and deliberation,
one of which is "evidence that the killing was done in a brutal man-
ner"). Defendant bases his claim on the assertion that the State's evi-
dence of premeditation and deliberation was weak and that the jurors
would otherwise have found him guilty of second-degree murder. As
we noted previously, defendant did not object to this argument at
trial, so the assignment of error is subject to the gross impropriety
standard.

As stated in *State v. McCollum*, 334 N.C. 208, 224, 433 S.E.2d 144,
152 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied*,
—— U.S. ——, 129 L. Ed. 2d 924 (1994), "[a]n argument 'asking the
jurors to put themselves in place of the victims will not be con-
doned.'" *Id.* (quoting *United States v. Pichnarcik*, 427 F.2d 1290,
1291 (9th Cir. 1970)). We note, however, that in the case *sub judice*,
counsel's argument was not as egregious as that in *McCollum*.
Following the analysis in *McCollum*, if we assume *arguendo* that the
challenged argument was improper, we still must determine "whether
these portions of the prosecutors' closing argument denied the
defendant due process." *McCollum*, 334 N.C. at 224, 433 S.E.2d at 152;
*see Darden v. Wainwright*, 477 U.S. 168, 91 L. Ed. 2d 144, *reh'g
denied*, 478 U.S. 1036, 92 L. Ed. 2d 774 (1986).

While the defendant limited his assignments of error to the
excerpt above, "we have long held that arguments are to be evaluated
in context." *State v. Larrimore*, 340 N.C. 119, 160, 456 S.E.2d 789, 811
(1995). Therefore, we should also consider the arguments preceding
the challenged comments together with the challenged argument, in
which the prosecutor argued:

> [Defendant's alleged intoxication] did not interrupt or prohibit his
> specific intent to kill Felicia Houston on December the 28th.
>
> This is a plan he had had for sometime [sic]. If not—we know
> he had it at two p.m., if not several days, if not weeks prior to
> that.

Of course, the defense will argue that's not in the evidence. You can infer facts from the evidence. You can use your common sense, you see. This is a very cruel, calculated murder.

So the last element is that the defendant acted after premeditation, however short.

And, fifth, that the defendant acted with deliberation, which means that he acted while he was in a cool state of mind. This does not mean that there has to be a totally [sic] absence of passion or emotion. If the intent to kill was formed with a fixed purpose, it is immaterial that the defendant was in a state of passion.

Now, the Judge will instruct you that premeditation, neither that nor deliberation, is usually susceptible of direct proof. In other words, you can't read the man's mind. Okay. But this may be proved by proof of circumstances from which they may be inferred, such as lack of provocation by the victim, right. What did Felicia Houston do—let's assume it was a drug dealer. It's all the same. It's still first degree murder, is it not?

What did Felicia Houston do to deserve this? Nothing. This is first degree murder. That's just the bottom line.

Well, you heard all of the medical evidence. You heard what a torturous death she had. You recall Dr. Bower testifying about each time she would breathe with that arrow still in her, given that—totally sliced and mutilated the nerves, how it was painful. So severely painful for her even to breathe. The pain she must have suffered.

She didn't die right away, did she? She didn't die right away. She was shot at six thirty, she died the next morning at what, ten thirty. Can you imagine? What if this had been your daughter? What if this had been your child? Can you imagine anything worse?

We hold that the prosecutor's comments here did not "manipulate or misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *McCollum*, 334 N.C. at 224, 433 S.E.2d at 152. The trial court instructed the jurors that their decision was to be made on the basis of the evidence alone and that the arguments of counsel were not evidence. *Id.* Further, the testimony, as presented above, shows that defendant's intent to kill was overwhelming. Finally, the jury found as

an aggravating circumstance that the murder was part of a course of conduct in which the defendant engaged.

In short, given all of these factors, the likelihood that the jury's decision was influenced by the challenged portion of the prosecutor's closing argument is inconsequential. The evidence that defendant committed cold, senseless and calculated first-degree murder against the victim was overwhelming. Thus, the prosecutor's closing argument was not so grossly improper that it denied defendant a fair trial.

This assignment of error is overruled.

## III.

[3] In defendant's final assignment of error, he contends that defense counsel rendered ineffective assistance of counsel by conceding defendant's guilt during closing argument, in violation of defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23 and 24 of the North Carolina Constitution.

A defendant's right to counsel includes the right to the effective assistance of counsel. When a defendant attacks his conviction on the basis that counsel was ineffective, he must show that his counsel's conduct fell below an objective standard of reasonableness. In order to meet this burden defendant must satisfy a two part test.

First, the defendant must show that counsel's perform-ance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

State v. Braswell, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985) (quoting Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, reh'g denied, 467 U.S. 1267, 82 L. Ed. 2d 864 (1984)) (alteration in original) (citations omitted).

Here, defendant specifically challenges the following comments by defense counsel:

**STATE v. HINSON**

[341 N.C. 66 (1995)]

Mr. Brown, when you [sic] going to stand up and take responsibility, Mr. Brown? Mr. Brown wasn't a tool. He was the engine. He was the engine that made everything possible. He is the tool without which Mr. Hinson could not have even have gotten out of his yard. But Mr. Brown's going to be home for Christmas apparently.

Defendant relies on *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986), in support of his contention that, in making the comments noted above, defense counsel admitted defendant's guilt without his consent and, therefore, rendered ineffective assistance of counsel. Defendant argues that during closing argument, defense counsel argued, without his consent, that Mr. Brown was guilty of murder, and in doing so, he effectively conceded his own client's guilt. We disagree. In *Harbison*, the defendant's counsel told the jury that he did not "feel that [defendant] should be found innocent. I think he should do some time to think about what he has done. I think you should find him guilty of manslaughter and not first degree." *Id.* at 178, 337 S.E.2d at 506. This Court concluded that "ineffective assistance of counsel, per se in violation of the Sixth Amendment, has been established in every criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent," *id.* at 180, 337 S.E.2d at 508, and arrested the defendant's judgments for murder and assault and remanded for a new trial.

We find the instant case wholly distinguishable from *Harbison*. Again, defendant has taken the challenged comments out of context. Upon review of the trial transcript, nowhere in the record did defense counsel concede that defendant himself committed any crime whatsoever. Defense counsel maintained throughout the trial that Brown, not defendant, killed the victim. Accordingly, defendant has failed to satisfy the first prong of the *Strickland* test by failing to show that his "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Braswell*, 312 N.C. at 562, 324 S.E.2d at 248.

This assignment of error is overruled.

In summary, defendant here was convicted by a jury after a fair trial, free of prejudicial error.

NO ERROR.