STATE OF NORTH CAROLINA v. KEITH DEDRICK WILEY

No. 100A01

(Filed 28 June 2002)

**1. Search and Seizure— Fourth Amendment—expectation of privacy—letters from prison inmate**

The trial court did not err in a capital first-degree murder prosecution by admitting a letter written by defendant while in the New Hanover jail which was read by jail personnel pursuant

to an announced policy. Defendant did not have a subjective expectation of privacy in the unsealed envelope he handed to a deputy and, even if he did, that expectation was not objectively reasonable.

**2. Appeal and Error— juvenile adjudication—aggravating circumstance—motion for appropriate relief—ineffective assistance of counsel—claims not before Supreme Court**

The substance of a motion for appropriate relief presented in defendant's prior juvenile case, which resulted in an adjudication of delinquency used as an aggravating circumstance in defendant's capital sentencing proceeding, was not properly before the Supreme Court in an appeal from defendant's first-degree murder conviction and sentence of death where the Court had previously denied review of the trial court's ruling on that motion. Furthermore, defendant's ineffective assistance of counsel claim with regard to his attorney's handling of the motion for appropriate relief in the juvenile case was inappropriate in defendant's appeal from the murder conviction and death sentence but must be raised in a separate proceeding.

**3. Appeal and Error— preservation of issues—jury selection**

A defendant in a capital first-degree murder prosecution did not preserve for appeal the issue of whether the trial court erred by dividing prospective jurors into separate panels where defendant waived review on constitutional grounds by not challenging the organization of the jury panels at trial, waived his statutory allegations by failing to comply with the requirements of N.C.G.S. § 15A-1211(c), and did not preserve plain error review with a mere statement in a footnote.

**4. Jury— selection—views on death penalty**

The trial court in a capital prosecution for first-degree murder did not err by excusing a prospective juror for cause because of his views on the death penalty where the juror initially indicated his ability to vote for the death penalty and follow the judge's instructions, then stated that he would automatically vote for life imprisonment without parole.

**5. Jury— selection—capital punishment—stake-out questions**

The trial court did not err in a capital first-degree murder prosecution by not allowing defense counsel to ask prospective

jurors improper stake-out questions concerning the kind of fact scenarios they would deem worthy of the death penalty or worthy of life imprisonment. Defendant was permitted to ask whether prospective jurors felt that the death penalty was the only appropriate punishment for premeditated and deliberate murder.

**6. Sentencing— capital—prosecutor's characterization of process**

The trial court did not err during jury selection in a capital first-degree murder prosecution by allowing the prosecutor to refer to the capital sentencing procedure with terms such as "highly structured," "tightly structured," and "rigid." Defendant's failure to object to some characterizations waived his argument and it could not be resurrected by alleging plain error; the alleged error is not analogous to cases where structural error has been found to exist; and, as to the instances where defendant objected, the trial court's instructions to the jury cured any error.

**7. Constitutional Law— effective assistance of counsel—reference in opening argument to physical evidence—not an admission**

A capital first-degree murder defendant was not denied effective assistance of counsel where his attorney in her opening statement may have signaled that physical evidence would link defendant to the victim's car, but she made it clear that such evidence was of dubious validity. In context, her statements hardly constitute an admission; moreover, admitting a fact is not equivalent to an admission of guilt.

**8. Criminal Law— prosecutor's closing argument—description of evidence—not grossly improper**

There was no gross impropriety requiring the trial court to intervene ex mero motu in a capital first-degree murder prosecution where defendant contended that the State in its closing argument made statements not supported by the evidence. The purpose of the State's argument was to respond to defendant's attacks on its witness's inconsistent statements and was within the wide latitude afforded counsel in making arguments.

**9. Criminal Law— prosecutor's closing argument—credibility of witnesses**

The prosecutor did not improperly vouch for the credibility of the State's witnesses during the closing argument in a capital

prosecution for first-degree murder where the prosecutor was merely giving the jury reasons to believe State's witnesses who had given prior inconsistent statements and who had at first been unwilling to cooperate with investigators.

**10. Appeal and Error— preservation of issues—mere allegation of plain error—insufficient**

Defendant did not preserve the issue of whether the trial court erred in a capital sentencing proceeding by not suppressing a juvenile delinquency adjudication based upon an admission of solicitation to murder on the ground that N.C.G.S. § 15A-2000(e)(3) conflicted with former N.C.G.S. § 7A-638 where defendant failed to make this argument at trial; merely relying on the words "plain error" without explaining why the error rises to that level waives appellate review.

**11. Constitutional Law— ex post facto prohibition—use of juvenile plea in capital sentencing**

The submission of a prior juvenile adjudication in a capital sentencing proceeding did not violate the ex post facto prohibition, even though defendant's delinquency plea came before the amendment to N.C.G.S. § 15A-2000(e)(3) allowing juvenile adjudications to be submitted as aggravating circumstances. Defendant is being punished for the present offense of first-degree murder rather than receiving additional punishment for his 1992 delinquent conduct. U.S. Const. art. I, § 10; N.C. Const. art. I, § 16.

**12. Evidence— letter written by juvenile—from law enforcement files—admissible**

The trial court did not err in a capital sentencing proceeding by admitting a letter written by defendant when he was fourteen that formed the basis of his juvenile adjudication for solicitation to commit murder where the letter was introduced from Sheriff's Department files through the testimony of the investigating officer. Although there was statutory protection for juvenile court records, there is no prohibition against the use of law enforcement records and the State properly introduced the evidence to illustrate the circumstances surrounding the prior adjudication.

**13. Sentencing— capital—merging jury instructions—not an unrecorded charge conference**

There was no prejudicial error in an alleged unrecorded charge conference in a capital sentencing proceeding where, at the end of one day, the trial court directed the parties to submit their proposed aggravating and mitigating circumstances by the next morning, court resumed the next afternoon, when the court apologized for keeping the jury waiting and explained that they had been working all morning on jury instructions, trying to merge two versions of word processing. Defendant did not argue that he was absent from court at any time or that his right to be present was violated and did not establish that what took place was an unrecorded charge conference rather than a clerical session. N.C.G.S. § 15A-1231(b).

**14. Appeal and Error— preservation of issues—suggestion by judge—failure to assign error**

Defendant's unsupported argument that the trial court erred in a capital sentencing proceeding by suggesting that the State look at the pattern jury instructions after the State submitted its proposed aggravating circumstances was not properly preserved for appellate review where defendant did not assign error. Moreover, the trial court did not err.

**15. Sentencing— capital—prosecutor's argument—disparagement of defendant's expert**

The trial court did not err by not intervening ex mero motu during the State's closing argument in a capital sentencing proceeding when the State disparaged defendant's expert witness. The State's argument was aimed at questioning the witness's ability to make a meaningful diagnosis after spending ninety minutes with defendant.

**16. Sentencing— capital—prosecutor's argument—proceeding tightly structured**

There was no error in a capital sentencing proceeding where the State in its closing argument characterized the proceeding as rigid and tightly structured. Although defendant argued that the comments invited the jury to disregard defendant's right to an individualized sentencing proceeding, viewed in context the prosecutor's argument proposed only that rules must be applied to capital sentencing and stressed that the jurors not base their decision on impermissible grounds.

STATE v. WILEY

[355 N.C. 592 (2002)]

**17. Sentencing— capital—aggravating circumstances—evidence—double counting—limiting instruction—separate evidence**

The trial court did not permit the jury in a capital sentencing proceeding to rely upon the same evidence in finding the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious or cruel that it used to find either of the two aggravating circumstances submitted under N.C.G.S. § 15A-2000(e)(5) that the murder occurred during the commission of an armed robbery or a first-degree kidnapping where the court instructed the jury that the same evidence could not be used as a basis for finding more than one aggravating circumstance, and there was substantial evidence of the especially heinous, atrocious, or cruel nature of the killing apart from the evidence that the murder was committed during the commission of a kidnapping or an armed robbery.

**18. Sentencing— capital—instructions—life imprisonment without parole**

The trial court did not err in a capital sentencing proceeding in its instructions on life imprisonment. Nothing in N.C.G.S. § 15A-2002 requires the judges to say "life imprisonment without parole" every time they allude to or mention the alternative sentence and the court's instruction in this case met the statutory instruction.

**19. Sentencing— capital—death penalty not disproportionate**

A sentence of death for first-degree murder was not disproportionate where the jury found defendant guilty under the theory of premeditation and deliberation and under the felony murder rule, and the jury found five aggravating circumstances, including two circumstances submitted under N.C.G.S. § 15A-2000(e)(5) that the murder was committed during the commission of first-degree kidnapping and during the commission of an armed robbery.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Lanier, J., on 27 May 1999 in Superior Court, New Hanover County, upon a jury verdict finding defendant guilty of first-degree murder. On 10 May 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 12 February 2002.

**STATE v. WILEY**

[355 N.C. 592 (2002)]

*Roy Cooper, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

MARTIN, Justice.

On 3 November 1997 Keith Dedrick Wiley (defendant) was indicted for the first-degree murder of George Richard "Richie" Futrelle, II (Futrelle or the victim). Defendant was tried capitally at the 10 May 1999 session of Superior Court, New Hanover County, and on 25 May 1999, the jury found defendant guilty of first-degree murder based on malice, premeditation, and deliberation and under the felony murder rule. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also entered consecutive sentences of 116 to 149 months for first-degree kidnapping and 103 to 133 months for robbery with a dangerous weapon. Defendant gave notice of appeal.

The state's evidence at trial tended to show the following: On 18 October 1997, fourteen-year-old Alicia Doster ran away from home to live with defendant and another male named Justin Pallas in an abandoned house located at 440 Morning Glory Drive in Wilmington. On the morning of 20 October 1997, Doster heard defendant say he was going to kill Richie Futrelle because Futrelle owed him twenty or twenty-five dollars for cocaine snorted the previous night. Defendant later explained to Doster and Pallas that he planned to kill Futrelle whether or not Futrelle had the money owed to defendant. Doster testified that Pallas asked Futrelle to come to the abandoned house. Defendant told Doster that his plan to kill Futrelle was as follows: Defendant and Pallas were to beat Futrelle after he sat down on the bed in a back bedroom, and then Doster was to give defendant and Pallas some cables to tie Futrelle up.

When the victim arrived at the abandoned house, defendant hit Futrelle in the head with a juice bottle. Futrelle fell to the floor, whereupon defendant and Pallas kicked and beat him. Defendant and Pallas took the victim's wallet, and defendant placed it in his jeans. Doster and Pallas then gagged the victim with a bandanna and hog-tied his hands and feet with the cables.

Defendant and Pallas then put the victim—still bound and gagged—into the trunk of the car in which he had arrived. The victim

repeatedly banged on the trunk and called out for help. In response, Pallas turned up the radio, and defendant commented on the song playing, saying, "this is the shit."

They drove to a remote area off Murrayville Road. When they opened the trunk, they saw that Futrelle had freed himself from the cables and was trying to get up. They removed him from the trunk and forced him to his knees so they could tie him up again. Doster gagged Futrelle while defendant and Pallas tied his hands behind his back and bound his feet so he could barely walk. As Doster followed behind with the gun, defendant and Pallas led Futrelle to a ditch filled with water and laid him on his back. Futrelle freed himself and tried to run, screaming, "no, man, no, don't do it." Defendant fired the gun at Futrelle, handed the gun to Pallas, and told him to "finish him off." Pallas then shot Futrelle twice.

Defendant, Pallas, and Doster then drove to the residence of John Mullins. En route, defendant and Pallas discussed how they shot Futrelle. Upon their arrival, defendant and Pallas told Mullins how they had killed Futrelle. Defendant told Doster to dispose of the victim's wallet, which Doster did. Defendant and Pallas returned to the victim's car and wiped it down to clean it. En route, they ran into friends Brian Jacobs and Jeremy Joesting, to whom they described the killing.

Deputy Carlton Floyd and Detective Kevin Foss of the New Hanover County Sheriff's Department went to the abandoned house around 3:00 p.m. the same day searching for Doster and Doster's car, which she had taken from her mother. They saw that the house was in disarray, and they found the car behind the house. Inside the house, they found a sawed-off .410 shotgun, a jacket, and some tools. The detectives, at that time unaware of Futrelle's murder, went to Mullins' house. When Mullins arrived at the door, Detective Floyd and other officers entered the residence and apprehended Doster and Pallas. Upon patting down Pallas, Detective Floyd found a box of .410 shotgun shells in his right pants pocket. Officers found a twelve-gauge shotgun, knives, and drug paraphernalia in the house. Defendant, Pallas, Doster, and Mullins were arrested, handcuffed, and transported to the Sheriff's Department for processing on various charges. During the booking process at the jail, Pallas took the victim's car keys out of his pocket and put them on the floor, where they were discovered by a jailer.

On 21 October 1997, Futrelle's mother called the police to report that her son was missing. On 23 October 1997, hunters contacted police about a body in a ditch off Murrayville Road. Deputy B.E. Parker and other officers from the Sheriff's Department went to the scene and observed the body of a man face-down in shallow water with his feet bound. Crime scene investigator Larry Hines observed three wounds, two on the back and one in the arm. The victim's feet were bound with a belt and cord, but the hands were not tied. Hines found tied cord about seven feet from the body. Officers also found plastic wadding from a shotgun shell when the body was rolled over and found another piece of wadding nearby.

Jim Gregory, special agent and forensic chemist with the State Bureau of Investigation (SBI), examined the cords and cables and determined that those found on Futrelle's body matched those recovered at the abandoned house.

An autopsy of Futrelle's body, performed by Onslow Memorial Hospital pathologist Dr. John Almeida, revealed a large, gaping gunshot wound in the right arm above the elbow, with an entrance in the front and an exit in the back. Dr. Almeida testified that this wound would have been painful but not fatal. The body also had a shotgun wound on the left thigh, two pellet wounds to the chest, and shotgun wounds to the back and buttock area. The slug to the victim's thigh broke his hip and would have been very painful but only fatal if left untreated. The buckshot in the victim's back, which ripped through his left lung and ruptured his aorta, also would have been very painful and immediately fatal. The slug to the victim's buttock damaged his kidney and partially ruptured the left lobe of his liver, which would have been excruciatingly painful and would have caused death in five to ten minutes. Dr. Almeida testified that the cause of death was multiple shotgun wounds.

On 23 October 1997, Deputy Floyd learned that Futrelle wore a white baseball cap and recalled that he had seen a white baseball cap at the abandoned house. Deputy Floyd went to visit Doster at her mother's home, but Doster said she knew nothing about Futrelle's death. On 26 October 1997, Doster went to the Sheriff's Department for an interview. While at the Sheriff's Department, Doster told officers that she was the one who had tied up Futrelle, had put him in the trunk, and had driven to the Murrayville Road location. She said that she did not see who shot Futrelle and that she did not know where his car was taken. She later testified that she did not tell the truth at the Sheriff's Department because she was scared and wanted to pro-

tect defendant and Pallas, whom she believed would get into more trouble than she would as a juvenile.

After Doster talked with officers at the Sheriff's Department on 26 October, Investigator Mike Sorg transported her to the juvenile service center. While en route to the center, Doster told Sorg that she felt bad about what had happened and that she had taken credit for something she did not do. Doster took Sorg to the area where defendant and Pallas had left Futrelle's car, and the next day, Sorg found the car in the woods. Deputy Hines examined the car and the surrounding area, and found a cord, a dishcloth, and an ashtray. No usable fingerprints were found on the car.

Eugene Bishop, SBI special agent assigned to the firearm and tool mark section, performed tests on the twelve-gauge shotgun. The tests showed that the shotgun was fired less than two feet from Futrelle's back. The wound in Futrelle's arm was consistent with having been caused by a shot from less than two feet away.

Charles Brown, an inmate housed in the same cell as defendant, informed investigators that defendant stated that he had killed a man because he was angry about a drug debt. Defendant said he shot the victim with a sawed-off shotgun once in the arm and once in the leg, causing the victim to fall into a ditch. Defendant said he handed the gun to another man, who went into the ditch and shot the victim.

Defendant presented no evidence in the guilt phase of the trial. Additional facts are provided as necessary below.

## PRETRIAL AND JURY SELECTION ISSUES

[1] Defendant argues that the trial court committed reversible error by denying his motion to suppress a letter intercepted by jail personnel. The letter contained the word "alibi" and listed various dates, times, and information concerning defendant's whereabouts and activities. The state used the letter during its case-in-chief as evidence tending to show that defendant was attempting to manufacture an alibi.

Evidence presented on *voir dire* showed that defendant had asked personnel at the New Hanover County jail to give an unsealed letter to defendant's father, who had visited defendant and who was still in the waiting room. In accordance with jail policy for incoming and outgoing mail without the words "legal mail" written on them and

not addressed to an attorney, Deputy Sheriff Ingram Cephas scanned the letter "to make sure there[] [was] no contraband or any issues which might lead to . . . a jail break or possible harm to any deputies" and to make sure detainees were not "communicating between cell blocks." Detainees are told of mail inspection policy when they enter the jail. Cephas testified that it was common practice for inmates to leave their nonlegal mail unsealed because they are aware of the subsequent examination of their mail by jail officials. While scanning the letter, Cephas saw dates that might have something to do with the case. Cephas made a copy of the letter, gave the original to defendant's father, and gave the copy to investigators.

On 10 May 1999, the trial court denied defendant's motion to suppress the letter. Defendant challenged the trial court's denial of his motion on the basis of his Fourth, Sixth, and Fourteenth Amendment rights under the United States Constitution as well as rights contained in Sections 19 through 23 of the North Carolina Constitution. In his brief to this Court, however, defendant grounds his argument on his First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, and "defendant's rights under the state constitution." Because defendant did not raise a First, Fifth, or Eighth Amendment challenge in his pretrial motion, or at any point during the trial, and because defendant abandoned his Sixth Amendment challenge by failing to support this assertion in his brief, we will consider only those arguments presented to the trial court and preserved for appeal. *See* N.C. R. App. P. 10(b)(1), 28(b)(6); *see also State v. Hunter*, 305 N.C. 106, 111-12, 286 S.E.2d 535, 539 (1982) (holding that the theory upon which the case was tried controls in determining the validity of exceptions and that a constitutional question not raised and passed upon in the trial court will not ordinarily be considered on appeal); *State v. Benson*, 323 N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (holding that a defendant may not raise a constitutional issue on appeal not presented to the trial court).

The Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. U.S. Const. amend. IV; *see also* N.C. Const. art. I, §§ 18, 19, 23. The Fourth Amendment protects against governmental invasions into a person's legitimate expectation of privacy, which has two components: (1) the person must have an actual expectation of privacy, and (2) the person's subjective expectation must be one that society deems to be reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 61 L. Ed. 2d 220, 226-27 (1979).

STATE v. WILEY

[355 N.C. 592 (2002)]

Given the realities of institutional confinement, any reasonable expectation of privacy a detainee retains necessarily is of diminished scope. *Bell v. Wolfish*, 441 U.S. 520, 557, 60 L. Ed. 2d 447, 480 (1979). Although inmates do not forfeit all constitutional protections by reason of their confinement in prison, *Wolff v. McDonnell*, 418 U.S. 539, 555-56, 41 L. Ed. 2d 935, 950-51 (1974), the threshold determination of whether a prisoner's expectation is "legitimate" or "reasonable," and thus deserving of the Fourth Amendment's protection, necessarily entails a balancing of the security interest of the penal institution against the privacy interest of the prisoner, *State v. Primes*, 314 N.C. 202, 210, 333 S.E.2d 278, 282 (1985). This is true for convicted prisoners as well as pretrial detainees who remain cloaked with a presumption of innocence. *State v. Martin*, 322 N.C. 229, 235, 367 S.E.2d 618, 621 (1988) (discussing *Wolfish*, 441 U.S. at 559, 60 L. Ed. 2d at 481).

The question in the instant case is whether defendant had an expectation of privacy in a letter, handed to jail personnel, contained in an unsealed envelope not marked with the words "legal" and not addressed to an attorney. We conclude defendant did not hold a subjective expectation of privacy in the unsealed envelope he delivered to Deputy Cephas, and even if he did, this expectation was not objectively reasonable.

In *Stroud v. United States*, 251 U.S. 15, 64 L. Ed. 103 (1919), the United States Supreme Court held that the Fourth Amendment rights of the accused were not violated when letters containing incriminating material written by a prisoner were intercepted by prison personnel and later used by the prosecution. *Id.* at 21-22, 64 L. Ed. 2d at 111. The United States Supreme Court noted the letters came into the possession of prison officials under established practice, reasonably designed to promote institutional discipline. *Id.* at 21, 64 L. Ed. at 111. Courts in other jurisdictions that have handed down opinions subsequent to *Stroud* have held jail officials do not violate an inmate's Fourth Amendment rights by inspecting the inmate's mail. *See, e.g., United States v. Whalen*, 940 F.2d 1027, 1034-35 (7th Cir.) (holding that, because prison officials are permitted to examine inmate mail to ensure that the mail does not interfere with the orderly running of the prison, contain threats, or facilitate criminal activity, there is no expectation of privacy in mail that inmates are required to leave unsealed), *cert. denied*, 502 U.S. 951, 116 L. Ed. 2d 352 (1991); *Smith v. Shimp*, 562 F.2d 423, 426-27 (7th Cir. 1977) (reasoning that what a pretrial detainee places in nonprivileged mail, he

knowingly exposes to possible inspection by jail officials and consequently yields to reasonable search and seizure); *United States v. Baumgarten*, 517 F.2d 1020, 1028 (8th Cir.) (holding that because the reading of an inmate's letter in accordance with established and known institutional practices did not violate constitutional guidelines, the "plain view" doctrine allowed the subsequent copying and dissemination of the letter), *cert. denied*, 423 U.S. 878, 46 L. Ed. 2d 111 (1975); *State v. Matthews*, 217 Kan. 654, 657-58, 538 P.2d 637, 641 (1975) (holding that, under circumstances where prisoner knew of official policy of reading prisoners' outgoing and unsealed mail, prisoner cannot say the state gained access to the contents of a letter by unlawful search and seizure); *State v. Cuypers*, 481 N.W.2d 553 (Minn. 1992) (holding that search of the outgoing mail of a pretrial detainee based on known jail security and safety regulations was not an unreasonable search); *State v. Johnson*, 456 S.W.2d 1, 2 (Mo. 1970) (holding that pretrial detainee cannot seek to preserve as private a letter he placed before the jail officials knowing it would be read by jailer prior to mailing); *State v. McKoy*, 270 Or. 340, 343-48, 527 P.2d 725, 726-28 (1974) (holding that, in light of the legitimate purpose for scrutiny of the mail, the order and security of the penal institution, and the fact the prisoner was aware of the institution's practice of reading prisoner mail, prisoner's Fourth Amendment right was not violated when the sheriff read, copied, and forwarded to the state's attorney a letter handed to him by the inmate in an unsealed envelope).

Although this Court has not specifically addressed the constitutional propriety of reading inmates' mail, we have held that a pretrial detainee has no reasonable expectation of privacy in his jail cell, and thus the jailer did not violate the Fourth Amendment when he read a detainee's notebook and found a letter urging someone to commit perjury at trial. *Martin*, 322 N.C. at 235, 367 S.E.2d at 621-22. We reasoned that because the jailer had the right to inspect anything he may have found in the cell, he also had the authority to read the inmate's notebook to better enable him to maintain order in the facility. *Id.*

When a prisoner or pretrial detainee is made aware that his nonlegal mail will be subjected to official scrutiny before reaching its intended recipient, pursuant to institutional policies to maintain order and safety, the inmate's constitutional rights are not violated by the subsequent examination of such mail because he or she has no reasonable expectation of privacy in it. Furthermore, because the

prison officials had the right to examine these letters, "there is no rule 'requiring them to close their eyes to what they discover.' " *McKoy*, 270 Or. at 347, 527 P.2d at 728 (quoting *United States v. Morin*, 378 F.2d 472, 475 (2d. Cir. 1967)). Copying and forwarding such letters thus does not violate Fourth Amendment prohibitions. Defendant's argument is without merit.

[2] Defendant next argues he received ineffective assistance of counsel (IAC) when his trial attorney allowed his prior delinquency adjudication to be used as an aggravating circumstance under N.C.G.S. § 15A-2000(e)(3). Defendant also contends that the trial court's failure to suppress the use of the delinquency adjudication during the penalty phase violated his rights as embodied in the Due Process and Ex Post Facto Clauses of the United States and North Carolina Constitutions. We address the issues surrounding defendant's IAC claim here and turn to the latter constitutional issues in the penalty phase discussion, *infra*.

On 12 May 1992, defendant, then age fourteen, was adjudicated delinquent pursuant to a plea agreement whereby defendant admitted he had committed the offense of solicitation to commit murder, a class E felony. On 4 May 1999, defendant filed a motion for appropriate relief (MAR) in District Court, New Hanover County, in the juvenile case (91 J 258). In his MAR, defendant contended his admission was not entered freely, voluntarily, and knowingly and that it was entered without the effective assistance of counsel. Following a hearing, the trial court entered an order denying the MAR. On or about 22 March 2001, defendant filed in this Court a petition for writ of certiorari and a motion to bypass the Court of Appeals (No. 176P01) seeking review of the trial judge's order in conjunction with the present appeal. On 5 April 2001, this Court denied defendant's petition for, writ of certiorari, *State v. Wiley*, —— N.C. ——, 548 S.E.2d 158 (2001), and defendant's motion to bypass the Court of Appeals, *State v. Wiley*, —— N.C. ——, 548 S.E.2d 158 (2001).

Defendant argues that the trial court erred by denying the MAR made in his juvenile case. Defendant also raises an IAC claim in regard to his attorney's handling of the MAR in the juvenile case and notes that the present record is inadequate to permit argument on this issue without the safeguards available in article 89 of chapter 15A of the North Carolina General Statutes. The substance of the MAR presented in the juvenile case is not properly before this Court because this Court has already denied review of the trial court's ruling on that motion. *Wiley*, —— N.C. at ——, 548 S.E.2d at 158.

Defendant's presentation of an IAC claim arising from a MAR in a different case is similarly inappropriate in this forum. As the IAC claim arises from defendant's juvenile case, it must be raised in a separate proceeding.

**[3]** Defendant next argues that the trial court's division of prospective jurors into separate panels violated the randomness requirement of jury selection. The trial court placed prospective jurors in five different panels composed of twenty-five people each, and announced its intention to call the panels one at a time. The trial court called the first panel of prospective jurors, and after this panel was exhausted, the trial court called in all the jurors from panels two and three. With six prospective jurors remaining on panels two and three, the trial court called in panel four. When the jury selection process was completed and selection of alternates began, jurors were still being called from panel four, and before panel four was exhausted, the trial court called in panel five.

Defendant asserts that when only one prospective juror remains, all parties know the identity of the next person called into the jury box. This division, defendant claims, constituted "structural error" that violated the randomness requirement of N.C.G.S. § 15A-1214(a) and defendant's right to a fair and impartial jury under the Sixth Amendment to the United States Constitution and Article I, Sections 23 and 24 of the North Carolina Constitution.

Defendant did not challenge the organization of the jury panels at trial, on constitutional grounds or otherwise, and therefore has waived review of the constitutionality of the trial court's actions. *See State v. Golphin*, 352 N.C. 364, 411, 533 S.E.2d 168, 202 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001); *see also State v. Cummings*, 353 N.C. 281, 292, 543 S.E.2d 849, 856, *cert. denied*, —— U.S. ——, 151 L. Ed. 2d 286 (2001). Defendant's statutory allegation is preserved for appellate review, however, because, "[w]hen a trial court acts contrary to a statutory mandate, the right to appeal the court's action is preserved, notwithstanding the failure of the appealing party to object at trial." *State v. Jones*, 336 N.C. 490, 497, 445 S.E.2d 23, 26 (1994).

N.C.G.S. § 15A-1214(a) provides: "The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called." N.C.G.S. § 15A-1214(a) (2001). A challenge to the organization of the jury:

(1) May be made only on the ground that the jurors were not selected or drawn according to law.

(2) Must be in writing.

(3) Must specify the facts constituting the ground of challenge.

(4) Must be made and decided before any juror is examined.

N.C.G.S. § 15A-1211(c) (2001). Defendant never challenged the jury selection process in writing and never objected in any way to the allegedly improper method of placing prospective jurors in panels. Because defendant failed to comply with the requirements of section 15A-1211(c), he has waived this assignment of error. *See State v. Workman*, 344 N.C. 482, 498-99, 476 S.E.2d 301, 310 (1996) (holding defendant's assignment of error to be without merit "[i]n light of the fact that defendant failed to follow the procedures clearly set out for jury panel challenges and further failed, in any manner, to alert the trial court to the alleged improprieties"); *see also Golphin*, 352 N.C. at 411-12, 533 S.E.2d at 202. Furthermore, by merely stating in a footnote that he specifically asserts plain error, defendant did not preserve plain error review. As we stated in *State v. Cummings*, 352 N.C. 600, 536 S.E.2d 36 (2000), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001), by simply relying on the words "plain error" as the extent of his argument, defendant fails to argue plain error and thereby waives appellate review. *Id.* at 636-37, 536 S.E.2d at 61; *see also* N.C. R. App. P. 10(c)(4).

**[4]** Defendant next challenges the trial court's excusal for cause of prospective juror Lindenschmidt because of his views on the death penalty. Defendant argues the state challenged this prospective juror because his answers indicated his "leanings were toward the punishment of life without parole" and the dismissal violated defendant's right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, and 24 of the North Carolina Constitution. Defendant also alleges that this violated his right to a fair and reliable sentencing hearing under the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, and 27 of the North Carolina Constitution.

The Sixth and Fourteenth Amendments prohibit exclusion of jurors in capital cases merely because they have reservations about the death penalty. *Witherspoon v. Illinois*, 391 U.S. 510, 516-23, 20 L. Ed. 2d 776, 782-85 (1968); *see also State v. Gregory*, 340 N.C. 365,

394-96, 459 S.E.2d 638, 654-56 (1995) (finding no error where prospective jurors were excused for cause because they demonstrated they would be unable to put aside their own opinions and follow the law), cert. denied, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Capital jurors must be impartial about finding the facts and applying the law, Wainwright v. Witt, 469 U.S. 412, 423, 83 L. Ed. 2d 841, 851 (1985), and jurors who are unable to articulate clearly their willingness to set aside their own beliefs on capital punishment and defer to the law may be excused for cause, State v. Brogden, 334 N.C. 39, 43, 430 S.E.2d 905, 907-08 (1993) (citing Lockhart v. McCree, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)). The holding in Wainwright established that a prospective juror was properly excluded when his or her views on the death penalty would

> "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." [Adams v. Texas, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980).] We note that . . . this standard . . . does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

469 U.S. at 424-26, 83 L. Ed. 2d at 851-53 (footnotes omitted). In the absence of an abuse of discretion, we will not disturb the trial court's decision to exclude prospective juror Lindenschmidt for cause. State v. Cunningham, 333 N.C. 744, 754, 429 S.E.2d 718, 723 (1993).

The record reveals prospective juror Lindenschmidt stated on several occasions during questioning that he would automatically vote for life imprisonment without parole. When questioned by the state, prospective juror Lindenschmidt initially indicated his ability to vote for a sentence of death and to follow the law. The state passed

the prospective juror to the defense, and the following questioning occurred:

> [DEFENSE COUNSEL]: [W]hat I'm trying to find out is if, in a case of premeditated and deliberate murder, no matter what the other facts and circumstances, if you would automatically vote for either the death penalty or for life without parole.

> JUROR NUMBER SEVEN:  Life without parole.

> [DEFENSE COUNSEL]:  No matter what the judge told you about the law?

> JUROR NUMBER SEVEN:  Yeah.

After defendant completed his questioning, the state asked to question prospective juror Lindenschmidt again based on answers he gave to defense counsel. The trial court permitted the questioning to be reopened, and the following transpired:

> [PROSECUTOR]: Mr. Lindenschmidt, in asking the questions a little while ago, I believe [defense counsel] asked you, would you automatically vote one way or the other, and you said life without parole, is that correct?

> JUROR NUMBER SEVEN:  Yes.

> [PROSECUTOR]: So you would always vote for life without parole?

> JUROR NUMBER SEVEN:  Yeah.

> [PROSECUTOR]: Okay. And is that—you've sort of had that opinion for a good while, I take it.

> JUROR NUMBER SEVEN:  Yes.

> [PROSECUTOR]: Okay. And you think that would substantially affect your ability to return a death penalty?

> JUROR NUMBER SEVEN: Possibly, unless something else came up to change my mind, but that would be my first opinion.

> [PROSECUTOR]: So you would—I believe the question you were asked, would you automatically vote life without parole, and you said yes.

> JUROR NUMBER SEVEN:  Yeah.

STATE v. WILEY

[355 N.C. 592 (2002)]

While Lindenschmidt initially indicated his ability to vote for the death penalty and follow the judge's instructions, he repeatedly stated he would "automatically" vote for life imprisonment without parole. Such responses imparted "the definite impression that [this] prospective juror would be unable to faithfully and impartially apply the law." *Wainwright*, 469 U.S. at 426, 83 L. Ed. 2d 852; *see also State v. Fair*, 354 N.C. 131, 144, 557 S.E.2d 500, 512 (2001) (trial court did not abuse its discretion by excusing juror who stated unequivocally that he would not follow the trial court's instructions on the law if they were inconsistent with his personal beliefs), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 70 U.S.L.W. 3741 (2002). The trial court properly excused prospective juror Lindenschmidt for cause. *See Cunningham*, 333 N.C. at 753-54, 429 S.E.2d at 723. Accordingly, we reject this argument.

**[5]** Defendant next contends the trial court interfered with his constitutional right to utilize peremptory challenges. After asking two prospective jurors whether they opposed life imprisonment without parole as a punishment for first-degree murder, the following colloquy ensued:

> [DEFENSE COUNSEL]: Have you ever heard of a case where you thought that life without the possibility of parole should be the punishment?

> [PROSECUTOR]: Objection.

> THE COURT: Sustained.

> [DEFENSE COUNSEL]: Let me ask this. Have you ever heard of a case where you thought that the death penalty should be the punishment?

> [PROSECUTOR]: Objection.

> BY THE COURT: Sustained.

Outside the presence of the jury, defendant offered to rephrase the objectionable questions and "ask each juror whether or not they [sic] could conceive of a case where life without the possibility of parole ought to be the punishment." The state objected, arguing that because the defense had already asked the question of whether a prospective juror could fairly consider life in prison without parole, a question conceiving of different scenarios constituted an improper stake-out question. The trial court agreed, stating that it was "not going to allow the hypothetical aspect of the question."

Defendant then asked the court if he could ask the question if he proceeded to ask a follow-up question:

> [DEFENSE COUNSEL]: If I follow up with—if I follow my question, "can you conceive of . . . . Well, what type of case is that?" The issue is this, Judge: if the only kind of case a juror can conceive giving a life sentence in is a self-defense case—

> THE COURT: Why don't you ask them that question. I mean, you know, the question I've always seen asked is, do you think that the death penalty is the only appropriate penalty for someone who has been convicted of first degree murder.

The trial court permitted defendant to ask several prospective jurors whether they felt that "the death penalty is the only appropriate punishment for people that are convicted of first degree murder when it's premeditated and deliberate."

Defendant argues that by precluding defense counsel from asking questions in which he could discern any bias or predisposition in the jurors, the trial court impaired defendant's right to exercise his peremptory challenges intelligently, in violation of defendant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 19, 23, and 24 of the North Carolina Constitution. He also contends the trial court's action violated defendant's right to a fair and reliable sentencing hearing under the Eighth and Fourteenth Amendments and Article I, Sections 19, 23, and 27 of the North Carolina Constitution.

*Voir dire* plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury because it is the means by which prospective jurors who are unwilling or unable to apply the law impartially may be disqualified from jury service. *Rosales-Lopez v. United States*, 451 U.S. 182, 188, 68 L. Ed. 2d 22, 28 (1981) (plurality opinion) ("Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled."); *see also State v. Anderson*, 350 N.C. 152, 170, 513 S.E.2d 296, 307 (*voir dire* serves the dual purposes of helping counsel determine whether a basis for a challenge for cause exists and of assisting counsel in exercising peremptory challenges), *cert. denied*, 528 U.S. 973, 145 L. Ed. 2d 326 (1999). *Voir dire* that impairs the defendant's ability to exercise his challenges

intelligently is grounds for reversal, irrespective of prejudice. *Swain v. Alabama*, 380 U.S. 202, 219, 13 L. Ed. 2d 759, 772 (1965), *overruled on other grounds by Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

In *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992), the United States Supreme Court held that a capital defendant must be allowed to ask during *voir dire* whether prospective jurors would automatically vote to impose the death penalty in the event of a conviction. *Id.* at 733-36, 119 L. Ed. 2d 492 at 505-07. This Court has stated:

> *Morgan* stands for the principle that a defendant in a capital trial must be allowed to make inquiry as to whether a particular juror would automatically vote for the death penalty. "Within this broad principle, however, the trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled; its rulings in this regard will not be reversed absent a showing of abuse of discretion."

*State v. Robinson*, 336 N.C. 78, 102-03, 443 S.E.2d 306, 317 (1994) (quoting *State v. Yelverton*, 334 N.C. 532, 541, 434 S.E.2d 183, 188 (1993)), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 650 (1995); *see also State v. Conner*, 335 N.C. 618, 644, 440 S.E.2d 826, 841 (1994) (defendant entitled to inquire under *Morgan* into whether a prospective juror would automatically vote for the death penalty irrespective of the facts and circumstances).

The fact that the trial court prevented defense counsel from asking questions concerning various fact scenarios that would cause jurors to vote for a particular punishment did not breach the mandate of *Swain* and *Morgan*. Far from being precluded from inquiring into and assessing suspected biases, defendant was allowed to ask prospective jurors the very question that frames the holding in *Morgan*: whether prospective jurors would automatically vote for the death penalty.

The initial questions defense counsel sought to ask were not inquiries into whether jurors would follow the law or the court's instructions, but rather were improper stake-out questions. *See State v. Jaynes*, 353 N.C. 534, 549-50, 549 S.E.2d 179, 191-92 (2001) (not improper for trial court to prohibit defense counsel from asking whether prospective jurors could imagine if there is anything that

they could hear that would make them consider a life sentence), *cert. denied*, —— U.S. ——, 152 L. Ed. 2d 220 (2002). We have repeatedly held that attempts to stake out a prospective juror in advance regarding what his or her decision might be under certain specific factual scenarios are improper. *See, e.g., State v. Simpson*, 341 N.C. 316, 336, 462 S.E.2d 191, 202 (1995), *cert. denied*, 516 U.S. 1161, 134 L. Ed. 2d 194 (1996); *State v. Skipper*, 337 N.C. 1, 19-20, 446 S.E.2d 252, 261-62 (1994), *cert. denied*, 513 U.S. 1134, 130 L. Ed. 2d 895 (1995). The questions asked by defense counsel in the instant case reflect just such improper efforts to pin down prospective jurors regarding the kind of fact scenarios they would deem worthy of the death penalty or worthy of life imprisonment.

Defendant argued both at trial and before this Court that his question should have been allowed because this Court has condoned a similar question asked by the state in *State v. Green*, 336 N.C. 142, 158-59, 443 S.E.2d 14, 23-24, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). In *Green*, the trial court allowed the state to ask each prospective juror if he or she "could conceive of any first-degree murder case where the juror believed the death penalty would be the right and correct punishment." *Id.* at 158, 443 S.E.2d at 24. In holding that the trial court did not err, the Court in *Green* recognized that the extent and manner allowed for questioning of prospective jurors is a matter within the trial court's discretion. *Id.* at 159, 443 S.E.2d at 24. Contrary to defendant's assertion, a finding that there was no abuse of discretion in *Green* does not transform such a question into a constitutionally required inquiry for all defendants. The trial court here did not abuse its discretion, but simply chose to exercise its discretion differently than did the trial court in *Green*. Defendant's argument is without merit.

[6] In his next argument, defendant claims the trial court committed constitutional error in failing to preclude the state from "grossly mischaracterizing" North Carolina's capital sentencing procedure. During jury selection, the state on various occasions referred to the capital sentencing proceeding by describing it as a "highly structured procedure," "a tightly structured process," "a rigid procedure," "a very tightly structured process," a "rigid structure," "a tightly structured procedure," "this tight structure of the law," "this tight process," a "rigid framework," a "strict structure," "a strictly defined legal process," "a tightly structured format," "a strict format," a "tightly rigid structure," and a "rigid sort of flow chart."

STATE v. WILEY

[355 N.C. 592 (2002)]

Defendant argues that the trial court's sanctioning of the state's various descriptions of a capital sentencing proceeding during jury selection violated defendant's constitutional rights because such a mischaracterization did not allow any juror to individualize his or her decision whether to impose a death sentence. *See Lockett v. Ohio*, 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990 (1978) (even if a jury finds no mitigating circumstances, each juror must still decide whether the death sentence is appropriate in a particular case). He further argues that by allowing the state to describe the capital sentencing proceeding in such inexorable terms, the trial court violated defendant's constitutional right to a fair and impartial adjudicator.

Our review of the transcript reveals that the state described the capital sentencing proceeding on approximately forty-six occasions during jury selection, each time employing a form of the phraseology noted above. The following quote fairly represents the tenor of the remarks to which defendant takes exception:

[PROSECUTOR]: Okay. As we indicated, the defendant is also charged with armed robbery and kidnapping, and the judge will give you the law on those charges, also. Now, if the defendant is found not guilty of the charges, of course, the case is over. If he is found guilty of first degree murder, then you move into a second stage, and that's called a sentencing stage, . . . where you determine whether or not death or life is the appropriate punishment for this crime. And the way you make that decision is through a rigid legal framework, a rigid legal framework—

[DEFENSE COUNSEL]: Objection. Ask the court to charge what the law is.

THE COURT: Overruled. He's talking about the process.

[PROSECUTOR]: And what you do is, following this rigid legal framework, you determine first—and His Honor will go over this, but I want to sort of give y'all a background so you understand my questions. Using this rigid legal framework, the first question you will determine is whether or not aggravating factors exist. Now, aggravating factors are factors that would call for the death penalty, and you will determine those from the evidence as you hear it from the stand, and they—in other words, you find facts and determine whether aggravating factors exist, and all twelve of you would have to agree to that, those aggravating factors, and the standard of proof is all on the state, and it's beyond a reasonable doubt, and we'll talk about that.

If you find no aggravating factors, then life imprisonment would be imposed. Then the next question, if you find aggravating factors exist, you go to the next question and you determine whether mitigating factors exist. Now, mitigating factors are factors that would call for a life sentence, and the defendant will have the burden of proof on mitigating factors, but it is not the same standard that the state has. One of you can find a mitigating factor, and then all of you should consider those mitigating factors.

But the gist of it is, you determine whether aggravating factors exist that call for the death penalty, whether mitigating factors exist that call for life, and then you get down to the third question, and you balance the two and you determine, based on the facts as you find them, whether the aggravating factors outweigh the mitigating. Actually, I think the question is worded, do the mitigating—are the mitigating insufficient to outweigh the aggravating? But the result is the same. The aggravating have to outweigh the mitigating and, if you find that, beyond a reasonable doubt, and you find that the aggravating are sufficiently substantial to call for the death penalty, then it would be your duty to impose a verdict of death. And it's a process that is a rigid process that you follow, so that you do not automatically find life and you do not automatically find death, but you go through this legal process.

Defendant acknowledges he failed to object to most of the statements he now challenges, but claims that all the errors are structural and therefore are preserved for appeal. Furthermore, he contends that "[i]n the event this Court holds otherwise, in those instances where defendant failed to object, he brings forward those errors under the 'plain error' rule."

It is well settled that an error, even one of constitutional magnitude, that defendant does not bring to the trial court's attention is waived and will not be considered on appeal. *State v. Smith*, 352 N.C. 531, 557-58, 532 S.E.2d 773, 790 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001); *see also State v. Nobles*, 350 N.C. 483, 498, 515 S.E.2d 885, 895 (1999) ("[T]he rule is that when defendant fails to object during trial, he has waived his right to complain further on appeal."). Additionally, this Court has held that plain error analysis applies only to jury instructions and evidentiary matters and has specifically declined to extend application of the plain error doctrine

to situations where a party failed to object to statements made by the other party during jury *voir dire*. *State v. Greene*, 351 N.C. 562, 566-67, 528 S.E.2d 575, 578, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000); *State v. Atkins*, 349 N.C. 62, 81, 505 S.E.2d 97, 109-10 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). Accordingly, where defendant failed to object to the state's characterization of the capital sentencing proceeding made during *voir dire*, defendant's argument is waived and cannot be resurrected through plain error analysis.

Defendant's argument that the state's allegedly improper characterization constituted structural error is also unavailing. We recently held that the state's alleged attempt to stake out prospective jurors as to their sentence recommendation did not constitute structural error. *State v. Anderson*, 355 N.C. 136, 142-43, 558 S.E.2d 87, 92-93 (2002). As we explained in *Anderson*, " 'structural error,' is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself,' " and has rarely been found to exist. *Id.* at 142, 558 S.E.2d at 92 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 113 L. Ed. 2d 302, 331 (1991)). The alleged error of which defendant complains is not analogous to cases where structural error has been found to exist. *See Sullivan v. Louisiana*, 508 U.S. 275, 281-82, 124 L. Ed. 2d 182, 190 (1993) (erroneous instruction to jury on reasonable doubt); *Vasquez v. Hillery*, 474 U.S. 254, 263-64, 88 L. Ed. 2d 598, 609 (1986) (unlawful exclusion of jurors of defendant's race); *Waller v. Georgia*, 467 U.S. 39, 44-50, 81 L. Ed. 2d 31, 37-41 (1984) (deprivation of right to public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 187-88, 79 L. Ed. 2d 122, 139 (1984) (deprivation of right to self-representation at trial); *Gideon v. Wainwright*, 372 U.S. 335, 343-45, 9 L. Ed. 2d 799, 805-06 (1963) (total deprivation of the right to counsel); *Tumey v. Ohio*, 273 U.S. 510, 532-35, 71 L. Ed. 749, 759 (1927) (absence of impartial judge). Structural error analysis is therefore inapposite to the present argument.

"[W]hile counsel is allowed wide latitude in examining jurors on *voir dire*, the form of counsel's questions is within the sound discretion of the trial court." *State v. Jones*, 339 N.C. 114, 134, 451 S.E.2d 826, 835 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995); *see also State v. Conaway*, 339 N.C. 487, 508, 453 S.E.2d 824, 837-38 ("The trial court has broad discretion to see that a competent, fair, and impartial jury is impaneled, and its rulings in that regard will not be reversed absent a showing of an abuse of its discretion."), *cert.*

*denied,* 516 U.S. 884, 133 L. Ed. 2d 153 (1995); *State v. Bryant,* 282 N.C. 92, 96, 191 S.E.2d 745, 748 (1972) ("The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion."), *cert. denied,* 410 U.S. 958, 35 L. Ed. 2d 691, *and cert. denied,* 410 U.S. 987, 36 L. Ed. 2d 184 (1973). The only question properly before us, then, is whether the trial court abused its discretion in declining to sustain defendant's few objections to the state's characterization of the capital sentencing proceeding. We hold that the trial court did not abuse its discretion in overruling defendant's objections.

" 'The purpose of *voir dire* is to ensure an impartial jury to hear defendant's trial.' " *Anderson,* 350 N.C. at 170, 513 S.E.2d at 307 (quoting *Gregory,* 340 N.C. at 388, 459 S.E.2d at 651). The right to an impartial jury recognizes that each side will be allowed to inquire into the ability of prospective jurors to follow the law, and questions designed to measure prospective jurors' ability to follow the law are proper within the context of *voir dire. State v. Jones,* 347 N.C. 193, 203, 491 S.E.2d 641, 647 (1997). We have also held that a jury has a duty to recommend a death sentence if it makes the findings pursuant to N.C.G.S. § 15A-2000(c). *State v. Holden,* 321 N.C. 125, 161, 362 S.E.2d 513, 535 (1987) (a jury may not exercise unbridled discretion and return a sentencing verdict wholly inconsistent with the findings it made pursuant to N.C.G.S. § 15A-2000(c)), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). One may reasonably interpret the state's questioning as seeking to determine whether the jurors could understand and follow the three-step sentencing procedure outlined in N.C.G.S. § 15A-2000(c). As such, this questioning was permissible. *Cf. State v. Zuniga,* 320 N.C. 233, 250, 357 S.E.2d 898, 910 (holding that it would be permissible to ask whether a juror would be able to consider the death penalty if the juror determined aggravating circumstances outweighed mitigating circumstances), *cert. denied,* 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

Even assuming, without deciding, that there were inaccuracies in the state's description of North Carolina's capital sentencing procedure, the trial court's instructions to the jury, which were in accordance with the North Carolina pattern jury instructions, cured any error. *See State v. Steen,* 352 N.C. 227, 249, 536 S.E.2d 1, 14 (2000) (holding that trial court did not abuse its discretion by overruling the defendant's objection to the state's jury selection questions where the defendant had ample opportunity to explain the significance of mitigating circumstances to prospective jurors and the trial court fully

instructed the jury on the procedure for determining punishment), *cert. denied*, 531 U.S. 1167, 148 L. Ed. 2d 997 (2001). Accordingly, defendant's argument must fail.

## GUILT-INNOCENCE PHASE

[7] Defendant argues he was denied effective assistance of counsel when his attorney made an "admission" during her opening statement that defendant was at the scene of the killing and that there was physical evidence linking defendant to the killing. Defense counsel emphasized in her opening statement that the identity of the killer and the credibility of the witnesses were at issue:

> You've heard [the prosecutor] tell you what the evidence will show and you've heard a lot during jury selection about the process you'll be going through. [The prosecutor] has told you what his evidence will show, and many of the facts he's mentioned to you are not disputed. A brutal murder was committed. The victim was Richie Futrelle, who was killed by multiple gunshot wounds. The facts of how he died are not in issue here. Who was involved and the extent of those persons' involvement are issues in this case. Also, the amount and credibility of evidence presented by the state are issues in this case.

Defense counsel then focused the jurors' attention on the anticipated testimony of Alicia Doster and her credibility as a witness:

> [DEFENSE COUNSEL]: You will only hear one person testify who was present or anywhere near present at the time that happened, and that person is Alicia Doster. She was fourteen at the time it happened. She was a runaway who stole her mother's car and went to stay in an abandoned house in the neighborhood. It was a house where many of the young kids stayed and hung out. . . .
>
> There's evidence that there was smoking and drinking and some drug use going on at that house. Now, she'll tell you that three people were involved and, you know, that's not disputed. Three people were apparently involved in that. The first one is Alicia Doster, and she has made a deal with the State of North Carolina to testify in this case. . . .
>
> Now, the second person who you'll hear about is Keith Wiley, and he's sitting in this courtroom today . . . .

Now, there is one [more] person who you won't see here, you won't hear from him, you won't see him, you won't hear anything from him at all, and that is Justin Pallas. And he's not present in the courtroom and he won't offer any testimony at all.

[PROSECUTOR]: Well, objection to that, your Honor.

THE COURT: Overruled.

[DEFENSE COUNSEL]: He was present at the time that all of this happened, and Miss Doster will certainly testify to that. . . .

. . . .

You will hear and see plenty of physical evidence, as well. Not much of this physical evidence will put Keith Wiley at the scene of the crime or at the scene where the automobile was disposed of. There will be no fingerprints on the car that belonged to Keith Wiley. You will hear that six cigarette butts were found in the car. Three of those belonged to two different males who were not identified. Don't know who put those cigarettes in the car or when. Don't know whose they were.

. . . .

. . . Nothing else was found in the scene—at the scene that belonged to Keith Wiley. None of Keith's fingerprints were found on the alleged murder weapon.

Defendant contends these remarks constitute IAC because they amount to an admission of guilt to which he did not consent. In *State v. Harbison*, 315 N.C. 175, 337 S.E.2d 504 (1985), *cert. denied*, 476 U.S. 1123, 90 L. Ed. 2d 672 (1986), this Court held that an admission to the jury of defendant's guilt by defense counsel without the consent of the defendant constitutes ineffective assistance of counsel and a *per se* violation of the Sixth Amendment to the United States Constitution and Article I, Sections 19 and 23 of the North Carolina Constitution. *Id.* at 178-80, 337 S.E.2d at 506-08.

Nowhere in defense counsel's remarks did she concede defendant was present at the scene. Although it is arguable that defense counsel signaled some physical evidence would be presented linking defendant to Futrelle's car, counsel made it clear that such evidence was of dubious validity because its origin was unknown. Placed in context, her statements hardly constitute an admission. *See, e.g., State v. Hinson*, 341 N.C. 66, 78, 459 S.E.2d 261, 268 (1995) (holding

that there was no *Harbison* violation where the defendant took challenged statements out of context). Admitting a fact is not equivalent to an admission of guilt. *State v. Strickland*, 346 N.C. 443, 454, 488 S.E.2d 194, 200 (1997) (where defense counsel repeatedly mentioned during jury *voir dire* the uncontroverted evidence that the defendant was holding the gun when the victim was killed, such statements were not the equivalent of asking the jury to find the defendant guilty of any charge, and therefore, *Harbison* does not control), *cert. denied*, 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). Accordingly, defendant's claim of IAC fails.

[8] Defendant next argues the state improperly vouched for the credibility of its witnesses and made statements not supported by the evidence during closing argument in violation of defendant's constitutional rights to due process and a fair trial. Because defendant did not object to the state's arguments to which he now assigns error, defendant must show that the alleged impropriety was so gross that the trial court abused its discretion in not correcting the arguments *ex mero motu*. *See Cummings*, 353 N.C. at 296-97, 543 S.E.2d at 858-59. "Under this standard, 'only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *State v. Anthony*, 354 N.C. 372, 427, 555 S.E.2d 557, 592 (2001) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996)); *see also State v. Smith*, 351 N.C. 251, 269, 524 S.E.2d 28, 41 (" '[T]he trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial.' ") (quoting *Atkins*, 349 N.C. at 84, 505 S.E.2d at 111), *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000).

As a general rule, counsel possesses wide latitude to argue facts in evidence and all reasonable inferences arising from those facts. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Counsel is prohibited, on the other hand, from arguing facts which are not supported by the evidence. *See, e.g., State v. Lynch*, 300 N.C. 534, 551, 268 S.E.2d 161, 171 (1980); *State v. Monk*, 291 N.C. 37, 53, 229 S.E.2d 163, 173 (1976). During closing argument, the state addressed the inconsistent statements made by Doster concerning the incident:

But then she came forward and began to tell the truth and has told pretty much the truth, and we'll get into that in a minute. . . . But when it comes to the defendant Wiley being involved in it, she's always said he was.

It happened at the house. He instructed her how to tie him up, how to tie Richie up. Wiley was there from the very beginning. The defendant was there from the very beginning, in her statement, constantly through it. Now, you can pick and you can say well, she didn't say this, that time, but she said this, this time. But she's always said Keith Wiley was there.

Defendant argues that because in her very first "statement" to the police, Doster denied any knowledge of the shooting, the state's argument that Doster "always said Keith Wiley was there" was not supported by the evidence.

The purpose of the state's argument was to provide a response to defendant's attacks on Doster's inconsistent statements to investigators regarding details of the incident. The state simply emphasized Doster's consistency in placing defendant in her rendering of the crime, once she did come forward, in order to counter defendant's focus on any inconsistencies in Doster's subsequent statements. It was a fact in evidence that every time Doster gave an affirmative account of the incident, she implicated defendant. Therefore, the state's argument that Doster always said Keith Wiley was there falls within the range of "wide latitude" we afford counsel in making arguments to juries because the argument was supported by the evidence. *See Williams*, 317 N.C. at 481, 346 S.E.2d at 410.

Even assuming for the sake of argument that Doster's first indication that she knew nothing about the murder was a "statement" and that the state's comment that Doster "always said Keith Wiley was there" was an inaccurate description of the evidence, such comment did not stray so far from the bounds of propriety as to impede defendant's right to a fair trial. We are not persuaded by defendant's characterization of the state's remark as grossly improper, especially in light of the fact that defense counsel did not think it prejudicial when spoken at trial, because there is no merit to the argument that the outcome of the trial would have been different had the court intervened *ex mero motu* to correct this alleged error.

[9] Defendant also argues that the prosecutor improperly vouched for the credibility of the state's witnesses during closing argument.

After mentioning prior statements made by Doster, the prosecutor stated, "then she came forward and began to tell the truth and has told pretty much the truth." After describing Mullins' reticence to recounting what he knew about the incidents, the prosecutor stated, "he's come forward and he's told the truth." When the prosecutor described how Jacobs had tried to avoid getting involved in the investigation, he said "he doesn't want to get thrust in the middle of this, and he tried to stay out of it, but he's come forward and he's told the truth." Finally, after he commented that Jeremy Joesting never said he was told about the murder by defendant or Pallas, the prosecutor stated, "Now, if we have some type of control or some type of way to massage them and threaten people, don't you know he would have said the same thing? But he was just telling the truth." Defendant argues that because the state's case rested primarily on the testimony of several witnesses who stated they either saw defendant commit the crimes or heard defendant describe his commission of the crimes, these comments during closing violated N.C.G.S. § 15A-1230(a), which provides that "[d]uring a closing argument to the jury an attorney may not . . . express his personal belief as to the truth or falsity of the evidence." N.C.G.S. § 15A-1230(a) (2001).

Defendant's characterization of this argument as one vouching for the state's witnesses is implausible. The prosecutor was merely giving the jury reasons to believe the state's witnesses who had given prior inconsistent statements and were previously unwilling to cooperate with investigators. *See, e.g., State v. Burrus*, 344 N.C. 79, 93-94, 472 S.E.2d 867, 877 (1996) (argument that accomplices who had entered plea agreement to testify against the defendant would have downplayed their own involvement if they had intended to lie on witness stand did not constitute improper vouching for the credibility of accomplices but was meant to give reasons why jury should believe state's evidence); *State v. Bunning*, 338 N.C. 483, 488-89, 450 S.E.2d 462, 464 (1994) (not improper vouching where prosecutor described state's witness as a "fine detective, this professional law-enforcement officer," and argued that witness should be believed because "[he] isn't going to put his reputation and his career on the line"). Even if we assume, without deciding, that the prosecutor's argument did constitute improper vouching for state witnesses, the argument was not so grossly improper as to require the court to intervene *ex mero motu*. This argument is therefore without merit.

## CAPITAL SENTENCING PROCEEDING

[10] As previously noted, on 12 May 1992, defendant was adjudicated delinquent pursuant to a plea agreement whereby defendant admitted that he had committed the offense of solicitation to commit murder, a class E felony. Defendant assigns error to the trial court's failure to suppress the juvenile adjudication and argues: (1) the statute authorizing the use of a juvenile adjudication of delinquency as an aggravating circumstance in a capital case conflicts with another statute, (2) submission of defendant's prior juvenile adjudication as an aggravating circumstance violated his right to due process, and (3) submission of the prior adjudication constituted an abridgement of the Ex Post Facto Clauses under the United States and North Carolina Constitutions.

N.C.G.S. § 15A-2000(e)(3), which was in effect at the time of the murder, allows for the submission of an aggravating circumstance to the jury upon a conviction of first-degree murder if:

[t]he defendant had been previously convicted of a felony involving the use or threat of violence to the person or had been previously adjudicated delinquent in a juvenile proceeding for committing an offense that would be a Class A, B1, B2, C, D, or E felony involving the use or threat of violence to the person if the offense had been committed by an adult.

N.C.G.S. § 15A-2000(e)(3) (2001). Defendant contends that N.C.G.S. § 15A-2000(e)(3) conflicts with former N.C.G.S. § 7A-638, which provided as follows:

An adjudication that a juvenile is delinquent or commitment of a juvenile to the Division of Youth Services shall neither be considered conviction of any criminal offense nor cause the juvenile to forfeit any citizenship rights.

N.C.G.S. § 7A-638 (1995) (repealed effective 1 July 1999 and recodified at N.C.G.S. § 7B-2412).

Prior to trial, the trial court denied defendant's motion to suppress his prior adjudication of delinquency. Defendant renewed his motion during the penalty phase of the trial, and the trial court again ruled the adjudication was admissible. However, at no point prior to this appeal did defendant make the argument that N.C.G.S. § 15A-2000(e)(3) conflicted with N.C.G.S. § 7A-638. Defendant asserts plain error but provides no explanation as to why any alleged error

STATE v. WILEY

[355 N.C. 592 (2002)]

rises to the level of plain error. As noted previously, by simply relying on the words "plain error" as the extent of his argument in support of plain error, defendant has effectively failed to argue plain error and has thereby waived appellate review. *See Cummings*, 352 N.C. at 636-37, 536 S.E.2d at 61; *see also* N.C. R. App. P. 10(c)(4).

[11] We next turn to whether the submission of defendant's prior juvenile adjudication comported with due process and whether it violated state and federal constitutional prohibitions against the enactment of *ex post facto* laws. *See* U.S. Const. art. I, § 10; N.C. Const. art. I, § 16. Because defendant did not raise these constitutional issues at trial, he has failed to preserve them for appellate review and they are waived.[1] N.C. R. App. P. 10(b)(1); *Benson*, 323 N.C. at 322, 372 S.E.2d at 519; *Hunter*, 305 N.C. at 112, 286 S.E.2d at 539. Pursuant to our authority under Rule 2 of the North Carolina Rules of Appellate Procedure to foreclose manifest injustice, however, we address defendant's *ex post facto* argument to ascertain whether the trial court committed reversible error under a plain error analysis. *See State v. Lemons*, 352 N.C. 87, 92, 530 S.E.2d 542, 545 (2000) (for constitutional issue addressed pursuant to Court's discretionary authority under Rule 2 of the North Carolina Rules of Appellate Procedure, the defendant's failure to object at trial and to raise a constitutional issue required consideration of his argument under plain error standard of review), *cert. denied*, 531 U.S. 1091, 148 L. Ed. 2d 698 (2001).

The United States and the North Carolina Constitutions prohibit the enactment of *ex post facto* laws. U.S. Const. art. I, § 10 ("No state shall . . . pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts . . . ."); N.C. Const. art. I, § 16 ("Retrospective laws, punishing acts committed before the existence of such laws and by them only declared criminal, are oppressive,

---

1. In his pretrial motion to suppress, defendant contended that his solicitation to commit murder plea was not entered freely, voluntarily, and knowingly. At the pretrial motion hearing, defendant did not argue the motion based on due process. Similarly, prior to sentencing, defendant renewed his motion but did not argue it on due process grounds. Defendant abandoned his due process position at trial and cannot now revitalize it on appeal. *See* N.C. R. App. P. 10; *State v. Larrimore*, 340 N.C. 119, 149, 456 S.E.2d 789, 805 (1995); *see also Weil v. Herring*, 207 N.C. 6, 6, 175 S.E. 836, 838 (1934) (noting that "the record discloses that the cause was not tried upon [the defendant's] theory, and the law does not permit parties to swap horses between courts to get a better mount in the Supreme Court.") Additionally, as noted previously, defendant raised this issue in a MAR, review of which has already been denied by this Court. *Wiley*, —— N.C. ——, 548 S.E.2d 158.

unjust, and incompatible with liberty, and therefore no ex post facto law shall be enacted."). Because both the federal and state constitutional *ex post facto* provisions are evaluated under the same definition, we analyze defendant's state and federal constitutional contentions jointly. *See State v. Robinson*, 335 N.C. 146, 147-48, 436 S.E.2d 125, 126-27 (1993). The prohibition against the enactment of *ex post facto* laws applies to

> "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender."*

*Collins v. Youngblood,* 497 U.S. 37, 42, 111 L. Ed. 2d 30, 38-39 (1990) (quoting *Calder v. Bull,* 3 U.S. 386, 390, 1 L. Ed. 648, 650 (1798)) (alterations in original).

Defendant argues that allowing the state to submit his 12 May 1992 adjudication of delinquency as an aggravating circumstance at sentencing violated the prohibition against *ex post facto* laws because the 12 May 1992 adjudication of delinquency predated the amendment to N.C.G.S. § 15A-2000(e)(3) allowing juvenile adjudications to be submitted to a jury as aggravating circumstances. Defendant further argues that N.C.G.S. § 15A-2000(e)(3) rendered his delinquency plea involuntary and nullified his right to fair notice that his delinquency adjudication would be used against him. We disagree.

In *State v. Taylor,* 128 N.C. App. 394, 496 S.E.2d 811, *aff'd per curiam,* 349 N.C. 219, 504 S.E.2d 785 (1998), we affirmed a Court of Appeals opinion addressing an issue very similar to the present case. The defendant in *Taylor* was convicted of second-degree rape in 1996. *Id.* at 396, 496 S.E.2d at 813. Upon sentencing, the trial court aggravated the defendant's sentence for the rape with a prior adjudication of delinquency. *Id.* at 396-97, 496 S.E.2d at 813. The effective date of the Structured Sentencing Act, which permitted the sentencing court to consider prior adjudications of delinquency as an aggravating factor in noncapital felony convictions, was 1 October 1994. *Id.* at 397-98, 496 S.E.2d at 814. When the defendant was adjudicated

delinquent, the operative law allowed the sentencing court to aggravate a defendant's sentence based only on prior criminal convictions obtained in adult proceedings. *Id.* at 397, 496 S.E.2d at 813-14. The defendant argued that the retroactive application of the delinquency aggravating factor to his subsequent rape conviction violated the prohibition against the enactment of *ex post facto* laws. *Id.*

The use of the juvenile adjudication was held not to violate the *ex post facto* clauses in *Taylor* because the defendant had not been punished for conduct that was not proscribed at the time it occurred and because he was not punished more severely for the delinquent conduct than allowed under the law governing at the time of that conduct. *Id.* at 397, 496 S.E.2d at 814. The only crime subject to *ex post facto* analysis in *Taylor* was the second-degree rape that occurred on 19 March 1995. *Id.* at 397-98, 496 S.E.2d at 814. Because the sentencing statute, N.C.G.S. § 15A-1340.16(d)(18a), which was in effect on the date of the crime, did not aggravate second-degree rape or make the punishment greater than it was on 19 March 1995, we upheld the Court of Appeals' decision that there was no *ex post facto* violation. *Id.*

Similarly, in the instant case, the only crime subject to an *ex post facto* analysis is the offense of first-degree murder that occurred on 20 October 1997. Section 15A-2000(e)(3), which was amended effective 1 May 1994 and was applicable to offenses committed on or after that date, permitted the use of a prior adjudication of delinquency as an aggravating circumstance for submission to the jury in a capital proceeding. Section 15A-2000(e)(3) does not criminalize defendant's 1992 delinquent conduct without fair notice, as defendant alleges, nor does it aggravate the 1992 juvenile adjudication, render it an involuntary plea, or inflict greater punishment for that conduct than was allowed at the time it was committed. Defendant is not receiving additional punishment for his 1992 delinquent conduct, but rather is being punished for the present offense of first-degree murder.

The Colorado Supreme Court has addressed an issue similar to the one in the instant case. The situation in *Myers v. District Ct. for Fourth Jud'l Dist.*, 184 Colo. 81, 518 P.2d 836 (1974), involved a Colorado statute permitting direct filings against juveniles over the age of sixteen who had been adjudicated delinquent within the previous two years for acts that would have been felonies if committed by an adult. *Id.* at 83-84, 518 P.2d at 837. The petitioners asserted that the direct filing constituted an additional penalty for their prior adjudications of delinquency. *Id.* at 84, 518 P.2d at 838. The court held that

the statute did not punish prior adjudications of delinquency, but merely provided a mechanism whereby juveniles may be treated as adults. *Id.* at 84-85, 518 P.2d at 838.

> Thus, the section imposes a potentially greater penalty upon the alleged felonious conduct in light of the record of delinquency of the accused. The penalty is for the second incident of allegedly felonious conduct which was committed after the effective date of the section. Petitioners' situation is "aggravated" by the recent amendments to the Children's Code only because of their alleged actions since the effective date of such amendments. This is not an ex post facto law.

*Id.* at 84, 518 P.2d at 838.

A line of cases providing illumination on the present issue is found in judicial analysis of habitual felon statutes, where underlying felonies occurring before the enactment of habitual felon statutes have been upheld against *ex post facto* challenges. *See Gryger v. Burke*, 334 U.S. 728, 92 L. Ed. 1683 (1948); *State v. Todd*, 313 N.C. 110, 117-18, 326 S.E.2d 249, 253 (1985). As the United States Supreme Court declared, an enhanced sentence "is not to be viewed as either a new jeopardy or additional penalty for the earlier crimes. It is a stiffened penalty for the latest crime, which is considered to be an aggravated offense because a repetitive one." *Gryger*, 334 U.S. at 732, 92 L. Ed. at 1687. For the foregoing reasons, we reject this argument.

**[12]** Defendant next argues that the trial court committed constitutional and statutory error by admitting a letter written by defendant when he was fourteen that had formed the basis of defendant's juvenile adjudication for solicitation to commit murder. At the sentencing hearing, following an *in camera* hearing regarding the admissibility of the evidence, the state introduced the letter from the Sheriff's Department files through Detective Kurt Bartley, the officer who had investigated the 1992 solicitation offense. Defendant failed to raise any constitutional issue regarding the admission of the letter at trial. Thus, to the extent defendant argues that the admission of the letter was constitutional error, this Court will not consider such assignment of error for the first time on appeal. *See* N.C. R. App. P. 10(b)(1); *Benson*, 323 N.C. at 321-22, 372 S.E.2d at 519.

Defendant argued, in a pretrial motion to suppress the juvenile file and by objection at trial, that the admission of the letter violated

the statute providing for confidentiality of juvenile court records. *See* N.C.G.S. § 7A-675 (1989) (repealed 1998 and recodified at N.C.G.S. ch. 7B, art. 30). Because it formed the basis of defendant's admission to solicitation to commit murder, defendant argues the letter was constructively part of defendant's juvenile file regardless of where the document was stored. Defendant further argues that allowing disclosure of confidential records violates the intent and purpose of the confidentiality requirement of the 1992 juvenile code.

The state correctly points out that at all times (at the time defendant was adjudicated delinquent, at the time of the murder, and at the time of defendant's trial for murder), there was no prohibition against the use of *law enforcement* records and files. Instead, the statute provided only for the confidentiality of *juvenile* records. The statute explicitly stated:

> Law-enforcement records and files concerning a juvenile shall be kept separate from the records and files of adults except in proceedings when jurisdiction of a juvenile is transferred to superior court. Law-enforcement records and files concerning juveniles shall be open only to the inspection of the prosecutor, court counselors, the juvenile, his parent, guardian, and custodian.

N.C.G.S. § 7A-675(e). In the absence of a prohibition on the use of law enforcement files, the state properly introduced evidence about the prior adjudication, as it would for a prior violent felony conviction, to illustrate the circumstances surrounding the offense of solicitation to commit murder. *See State v. Roper*, 328 N.C. 337, 364-65, 402 S.E.2d 600, 616 (holding that "the State is entitled to present witnesses in the penalty phase of the trial to prove the circumstances of prior convictions and is not limited to the introduction of evidence of the record of conviction"), *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d 232 (1991); *State v. Taylor*, 304 N.C. 249, 279-80, 283 S.E.2d 761, 780-81 (1981) (holding that although the defendant stipulated to the fact of his prior conviction, the state could introduce testimony concerning the murder at sentencing because " 'the purpose for considering aggravating and mitigating circumstances is to engage in a character analysis of the defendant to ascertain whether the ultimate penalty is called for in his or her particular case' ") (quoting *Elledge v. State*, 346 So. 2d 998, 1001 (Fla. 1977)), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398 (1983). This argument is without merit.

[13] Defendant next argues that his constitutional and statutory rights were violated when the trial court held an unrecorded charge

conference during the capital sentencing proceeding. After defendant concluded his presentation of evidence during the capital sentencing proceeding, the trial court excused the jury for the day, and the parties proceeded with the charge conference. The trial court directed the parties to submit their proposed aggravating and mitigating circumstances by the next morning and stated, "My secretary will be here in the morning at 9:00 and, hopefully, we can put those things together and then we can get on with the jury arguments." The parties informed the trial court that defendant already possessed the state's proposed aggravating circumstances and the state requested disclosure of defendant's proposed mitigating circumstances. The parties then explained to the trial court what statutory aggravating and mitigating circumstances were being requested. The trial court ended the evening conference stating, "All right, I'll see all of you here in the morning, and we'll be here sometime close to 9:00. Let's take a recess until—well, take a recess until 10:00."

The transcript contains the following reporter's parenthetical notation in the record: "(THE EVENING RECESS WAS TAKEN. COURT RESUMED SESSION ON 5/27/99 AT 12:47 P.M. WITH THE DEFENDANT AND HIS ATTORNEYS PRESENT, THE PROSECUTORS PRESENT, THE JURY ABSENT.)" Thereafter, the court made the following statement: "All right, ladies and gentlemen, I think we are about ready for the final arguments of the attorneys. Since 9:00, we've been here trying to work on the jury instructions, and I believe we have them close to the form that we can utilize." The jury returned to the courtroom at 12:54 p.m., and the court addressed the jurors as follows:

> Ladies and gentlemen of the jury, I want to apologize for keeping you waiting but, like so many things, we've been trying to merge two versions of word processing, and I am not good enough to do it. My secretary and the clerk have managed to get it done, but it has taken an inordinately long period of time. I do think that we are pretty much ready to proceed.

At the completion of the closing arguments, the trial court instructed the jury and then asked the parties whether there were any requests for additional instructions or corrections. Defense counsel stated, "Not from the defendant, Your Honor."

Defendant asserts that between 9:00 a.m. and 12:47 p.m. on 27 May 1999 the trial court held an unrecorded charge conference in violation of section 15A-1231(b), denying him his constitutional right to

meaningful appellate review of his trial. Defendant does not argue, however, that he was absent from the court at that time or that his right to be present was violated in any way. Section 15A-1231(b) provides:

> Before the arguments to the jury, the judge must hold a recorded conference on instructions out of the presence of the jury. At the conference the judge must inform the parties of the offenses, lesser included offenses, and affirmative defenses on which he will charge the jury and must inform them of what, if any, parts of tendered instructions will be given. A party is also entitled to be informed, upon request, whether the judge intends to include other particular instructions in his charge to the jury. The failure of the judge to comply fully with the provisions of this subsection does not constitute grounds for appeal unless his failure, not corrected prior to the end of the trial, materially prejudiced the case of the defendant.

N.C.G.S. § 15A-1231(b) (2001).

Defendant relies on language in *State v. Exum*, 343 N.C. 291, 470 S.E.2d 333 (1996), for the proposition that when the in-chambers conference is not recorded and the nature and content of the private discussion cannot be gleaned from the record, the state cannot show the error was harmless beyond a reasonable doubt, and the court must order a new trial. *Id.* at 294-96, 470 S.E.2d at 335. Defendant's reliance on *Exum* is mistaken, however, because the situation there involved the application of the harmless error standard to an *ex parte* in-chambers conference that implicated defendant's constitutional right to be *present* at every stage of the trial. *Id.* at 294, 470 S.E.2d at 335. Unlike the situation in *Exum*, defendant was present at the alleged charge conference, and challenges only its lack of recordation.

We further note that defendant has failed to establish that what took place that morning was, in fact, an unrecorded charge conference and not a clerical session in which the parties and court personnel attempted to get the instructions into a written format suitable for the jury. Assuming, without deciding, that it was an unrecorded charge conference, defendant is required to show he was materially prejudiced by any such conference in order to be entitled to a new sentencing hearing. *See* N.C.G.S. § 15A-1231(b). Defendant cannot show that anything that might have occurred during the unrecorded proceedings materially prejudiced his case because appellate review of defendant's case has not been thwarted.

In *State v. Wise*, 326 N.C. 421, 390 S.E.2d 142, *cert. denied*, 498 U.S. 853, 112 L. Ed. 2d 113 (1990), this Court addressed the requisite showing of material prejudice for purposes of an alleged violation of the recordation requirement under section 15A-1231(b). *Id.* at 432, 390 S.E.2d at 149. We held in *Wise* that where both sides indicated they were satisfied with the charge, defendant cannot show material prejudice from the failure to record the charge conference. *Id.* As in *Wise*, defendant in the instant case may not assign error to the lack of recordation where he had the opportunity to object to the charge but declined to do so. *See, e.g., State v. Bacon*, 326 N.C. 404, 412, 390 S.E.2d 327, 331 (1990) (defendant failed to show material prejudice where trial court summarized unrecorded proceeding into the record and defendant declined court's offer to object).

The substance of any rulings made by the trial court at an unrecorded conference would be evident from the record of the trial court's charge to the jury. Meaningful appellate review is not thwarted where the legal arguments of counsel are not recorded because it is the trial court's actual instructions that facilitate appellate review. *Cf. State v. Blakeney*, 352 N.C. 287, 307, 531 S.E.2d 799, 814 (2000) (defendant's argument that unrecorded bench conference on admissibility of evidence rendered appellate review impossible was rejected because it is the trial court's evidentiary rulings, the substance of which is apparent based on the resulting admission of evidence, not the arguments of counsel, that facilitate review), *cert. denied*, 531 U.S. 1117, 148 L. Ed. 2d 780 (2001). In any event, the lack of recording of a charge conference does not necessarily preclude meaningful appellate review because it does not prevent a defendant from assigning error to the trial court's jury instructions, as defendant has done in the instant case.

[14] Defendant alleges further that the trial court prejudiced him with regard to proposed instructions for aggravating circumstances. After the state submitted its proposed aggravating circumstances, the court stated, "All right. Well, look at the pattern jury instructions particularly on (e)(3) and (e)(5) because, as I see, there's wording there that you may want to have me give." Defendant contends that by offering assistance to the state, the court stepped out of its requisite neutral role and became an advocate for the state. Furthermore, defendant speculates that the trial court continued in its role as an advocate for the state during the alleged unrecorded charge conference. Defendant argues that this prejudiced him because it resulted in the trial court's ultimately giving more detailed pattern instruc-

tions on the aggravating circumstances. Defendant has not assigned error to the trial court's alleged advocacy even though it is found in the *recorded* portion of the proceedings. Defendant also has not assigned error to the pattern instructions given by the trial court on any grounds. Defendant's unsupported argument on this issue is without merit and is not properly preserved for our review. *See* N.C. R. App. P. 10(b)(1) and (2). As regards this portion of defendant's argument, we hold the trial court did not err.

**[15]** Defendant next assigns error to the trial court's failure to intervene *ex mero motu* during the state's closing argument during the sentencing proceeding. Defendant argues that he was prejudiced by the state's disparaging remarks about defendant's expert witness and by the state's exhortation to the jury to disregard defendant's right to an individualized sentencing proceeding. Because defendant did not object at trial to the state's arguments to which he now assigns error, he must show that the alleged impropriety was so gross that the trial court abused its discretion in not intervening *ex mero motu*. *See Cummings*, 353 N.C. at 296-97, 543 S.E.2d at 858-59.

During the sentencing phase, defendant introduced the testimony of Dr. Jerry Sloan, a psychiatrist. Dr. Sloan testified to defendant's history of mental disorders and the present nature of defendant's mental problems. During cross-examination, Dr. Sloan testified that he spent a total of ninety minutes with defendant. Dr. Sloan also testified that he spent about sixty minutes with defendant's parents and an unstated amount of time reviewing defendant's mental health records. During his closing argument, the prosecutor referred to "the 90-minute evaluation," on several occasions referred to Dr. Sloan as "the 90-minute specialist," and once referred to Dr. Sloan as the "90-minute man."

Although control of the jury argument is left to the discretion of the trial judge and counsel is allowed wide latitude in the closing argument of hotly contested cases, *State v. Fullwood*, 343 N.C. 725, 740, 472 S.E.2d 883, 891 (1996), *cert. denied*, 520 U.S. 1122, 137 L. Ed. 2d 339 (1997), the substance of these arguments is dictated by statute:

During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the

basis of matters outside the record except for matters concerning which the court may take judicial notice.

N.C.G.S. § 15A-1230(a). Defendant complains that the state's characterization undermined Dr. Sloan's credibility and insinuated that the jury should ignore the fact that defendant had been mentally ill since he was thirteen years old.

After careful review of the record, we conclude that the state's argument was proper and that the references to Dr. Sloan's examination were aimed at questioning his ability to make a meaningful and accurate diagnosis of defendant based on spending ninety minutes with him. *See State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996) (not improper for the state to impeach the credibility of an expert during closing argument), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997). Even though Dr. Sloan spent more than ninety minutes evaluating defendant's case, including time spent with his parents and with defendant's mental health records, the state's argument was clearly focused only on the ninety minutes spent with defendant.

Defendant's allegation that he was prejudiced by the suggestion that jurors disregard Dr. Sloan's testimony is belied by the fact that the jury found the existence of the (f)(2) and (f)(6) mitigating circumstances: that the murder was committed while defendant was under the influence of mental or emotional disturbance and that defendant's capacity to conform his conduct to the requirements of the law was impaired. We are convinced that by finding these statutory mitigating circumstances, members of the jury considered Dr. Sloan's testimony to be compelling and, more important for purposes of defendant's argument, that they found the state's characterization of Dr. Sloan insufficient to negate the compelling nature of his expertise.

[16] Defendant also challenges the state's characterization of the capital sentencing proceeding as a "rigid procedure" and a "tightly structured process," this time during the state's sentencing proceeding closing argument. Defendant also challenges the state's admonition to the jury that

[i]t's important . . . that y'all do your duty as a jury. You know, the law has got to treat everybody the same, and that's why we've got this tightly structured process that you go through. That's

why it's important that you stay within the parameters of that process.

Defendant argues the impropriety of the state's remarks should be characterized as "gross" because such comments invited the jury to disregard defendant's right to an individualized sentencing proceeding and implied that the jury could not consider or be compassionate regarding defendant's culpability. *See California v. Brown*, 479 U.S. 538, 545, 93 L. Ed. 2d 934, 942 (1987) (O'Connor, J., concurring) (principles of guided discretion and individualized consideration are necessary elements in a moral inquiry into the culpability of the defendant).

Viewed in its original context, the prosecutor's argument proposed only that rules must be applied to capital sentencing and stressed that the jurors not base their decision on impermissible grounds. *See State v. Rouse*, 339 N.C. 59, 93, 451 S.E.2d 543, 561-62 (1994) (holding that the prosecutor may make statements during closing arguments discouraging the jury from sympathy unrelated to the evidence affecting its decision), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995); *see also Brown*, 479 U.S. at 542-43, 93 L. Ed. 2d at 940-41 (instruction informing the jurors that they must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling does not by itself violate the Eighth and Fourteenth Amendments to the United States Constitution).

Defendant cites concerns noted in *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859 (1976), discussing *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346 (1972), that "the penalty of death not be imposed in an arbitrary or capricious manner . . . are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* at 195, 49 L. Ed. 2d at 887. Defendant further cites language from *Godfrey v. Georgia* that such guidance is sufficient only if it "channel[s] the sentencer's discretion by '["]clear and objective standards[,"]' [*Gregg*, 428 U.S. at 198, 49 L. Ed. 2d at 888 (quoting *Coley v. State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974)),] that provide 'specific and detailed guidance,' [*Proffitt v. Florida*, 428 U.S. 242, 253, 49 L. Ed. 2d 913, 923 (1976),] and that 'make rationally reviewable the process for imposing a sentence of death[,]' [*Woodson v. North Carolina*, 428 U.S. 280, 303, 49 L. Ed. 2d 944, 960 (1976)]." *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406 (1980).

**STATE v. WILEY**

[355 N.C. 592 (2002)]

Contrary to defendant's assertion, we perceive the prosecutor's remarks as attempting to move the jury toward, not away from, the directives of *Furman.* By characterizing the process as "tightly structured" or "rigid," the prosecutor was merely conveying the notion that the legislature has made rationally reviewable the weighty deliberative process involved in capital cases by calling attention and giving meaning to the three-step procedure outlined in section 15A-2000(c)(3). Rather than running contrary to the dictates of *Furman*—that the death penalty must be administered in a non-arbitrary fashion—the prosecutor's remarks channeled the jury's deliberative process toward the guideposts outlined in section 15A-2000(c)(3).[2] Moreover, defendant had the opportunity during closing argument to direct the jury's attention to the fact that it is wholly within the discretion and individualized consideration of each juror to decide whether a statutory aggravator is warranted by the evidence beyond a reasonable doubt, whether the aggravating circumstances are sufficiently substantial to call for the imposition of the death penalty, and whether the mitigating circumstances are insufficient to outweigh any found aggravating circumstances. Defense counsel did, in fact, make such an argument to the jury, stating:

> And you know, it's a guideline, and you've seen it right here, the guidelines that you're to follow in making your decision when you go back into the jury room. It's not exactly a rigid structure, because there are 12 of you and each of you bring to this courtroom your entire life of experience, and you've heard that you can come up with a mitigating factor, you can use the ones that we have submitted or, if there's something else about Keith Wiley that you believe he's—this [is] a case less likely for the death penalty, you can consider that. And that's not, you know, a tightly structured maze that guides you right through to only one conclusion. It doesn't. You are each allowed to be in there.

Defense co-counsel also argued during closing as follows:

> Twelve human beings have to go ahead and decide what level of proof . . . fully satisfies them that the death penalty is appropriate in this case. If there was a rigid procedure, we could grab that computer terminal over there and we could plug in the facts

---

2. The prosecutor's evenhandedness regarding the sentencing process is illustrated by the fact that he also stated, "You follow the questions and the answers, and you weigh these aggravating factors and you weigh the mitigating factors, and that leads you to the ultimate verdict."

and the computer terminal could tell us whether or not Keith Wiley lives or dies, but that's not the way it works.

Based on the foregoing, we hold that the trial court did not abuse its discretion in failing to intervene *ex mero motu* during the state's closing argument when the prosecutor characterized the capital sentencing proceeding as "rigid" or "tightly structured." This argument is meritless.

**[17]** Defendant next argues the trial court erred by failing to prevent the jury from "double-counting" the evidence. Defendant alleges the evidence supporting the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, overlapped with the evidence supporting two aggravating circumstances submitted under N.C.G.S. § 15A-2000(e)(5), that the murder occurred during the commission of robbery with a dangerous weapon and that the murder occurred during the commission of first-degree kidnapping. Defendant concedes that there was sufficient evidence to support robbery and kidnapping as separate aggravating circumstances.[3] Defendant argues, however, that a reasonable likelihood existed that the jury relied upon the same evidence in finding the (e)(9) aggravating circumstance that it relied upon in finding either the aggravating circumstance that the murder occurred during the commission of robbery with a dangerous weapon or the aggravating circumstance that the murder occurred during the commission of first-degree kidnapping. Even though the trial court gave a limiting instruction, defendant argues that this instruction was insufficient to satisfy the requirements of *State v. Gay*, 334 N.C. 467, 495, 434 S.E.2d 840, 856 (1993), in which this Court held that the trial court must instruct the jury so as to ensure that the jurors not use the same evidence to find more than one aggravating circumstance. Defendant also contends that, although he did not object to the trial court's instructions to the jury at the end of the sentencing evidence, the lack of a recorded charge conference impermissibly hindered his preservation of this issue for appellate review. Regardless of what transpired during the unrecorded portion of the trial, we choose to consider this issue, pursuant to N.C. R. App. P. 2, to avoid a perceived deprivation of meaningful appellate review.

---

3. Defendant assigned error to the trial court's submission of the (e)(9) aggravating circumstance on the ground that it was not supported by the évidence. Because he does not make this argument in his brief, however, defendant has abandoned this particular issue. *See* N.C. R. App. P. 28(a).

Upon instructing the jury on all the aggravating circumstances, the trial court instructed the jury in accordance with the pattern jury instructions as follows: "You are instructed that the same evidence cannot be used as a basis for finding more than one aggravating factor." Defendant indicated his satisfaction with the trial court's instruction by not objecting at that time and has provided no supporting authority for his contention that the pattern instruction was insufficient.

We have long held that a jury is presumed to follow the instructions given to it by the trial court. *State v. Jennings*, 333 N.C. 579, 618, 430 S.E.2d 188, 208 (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 85 L. Ed. 2d 344, 360 n.9 (1985)), *cert. denied*, 510 U.S. 1028, 126 L. Ed. 2d 602 (1993). Furthermore, any inadequacy in the instruction may be overcome by substantial evidence of the especially heinous, atrocious, or cruel nature of the killing apart from the evidence as to whether the murder was committed during the commission of first-degree kidnapping or robbery with a dangerous weapon. *Cf. State v. Moseley*, 338 N.C. 1, 56, 449 S.E.2d 412, 445 (1994) (holding that an error in failing to give *any* instruction was harmless where there was clearly sufficient, independent evidence to support each of the aggravating circumstances in question), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995).

Here, the victim was hog-tied and gagged, and his pleas for help were ignored after he was placed in the trunk of a car. The victim was tied up again after becoming untied, placed on his back in a ditch, shot while he pleaded for mercy, and shot again when defendant handed the weapon over to his accomplice to "finish him off" as the victim screamed. The pathologist who performed the autopsy on the victim noted that the wounds inflicted on the victim would have been excruciatingly painful. The record contains a wealth of evidence supporting the (e)(9) aggravating circumstance that surmounts a challenge to any alleged inadequacies in the trial court's limiting instruction. Further, this evidence does not overlap with other evidence showing that defendant took the victim's car by use of a deadly weapon and transported the victim to a remote area against his will for the purpose of inflicting serious bodily harm. Defendant's argument is nonmeritorious.

[18] Defendant next contends that the trial court erred by failing to instruct the jury adequately that a sentence of life imprisonment means life in prison without parole. He also contends that the error

was compounded when the Issues and Recommendation as to Punishment form erroneously described the punishment as "life in prison," not as "life in prison without parole."

At the beginning of its instructions to the jury during sentencing, the trial court stated:

All right, members of the jury, having found the defendant guilty of murder in the first degree, it is now your duty to recommend to the Court whether the defendant should be sentenced to death or to life imprisonment. Now, *again, when I say life imprisonment I mean life without parole.* Your recommendation will be binding upon the Court. If you unanimously recommend that the defendant be sentenced to death, the Court will impose a sentence of death. *If you unanimously recommend a sentence of life imprisonment, the Court will impose a sentence of life imprisonment without parole.*

(Emphasis added.) Defendant again alludes to his argument that, although he did not object to the instructions or the Issues and Recommendation as to Punishment form, the allegedly unrecorded charge conference precludes meaningful appellate review. Even though defendant was given a full opportunity to object at the conclusion of the trial court's instruction but did not do so, *see Wise,* 326 N.C. at 432, 390 S.E.2d at 149, we choose to consider this issue, pursuant to N.C. R. App. P. 2, to avoid a perceived deprivation of meaningful appellate review.

Defendant's contention mirrors one we recently rejected in *State v. Davis,* 353 N.C. 1, 40-41, 539 S.E.2d 243, 269 (2000), *cert. denied,* —— U.S. ——, 151 L. Ed. 2d 55 (2001). In *Davis,* the trial court instructed the jury, "If you unanimously recommend a sentence of life imprisonment, the court will impose a sentence of life imprisonment without parole," but the defendant argued the phrase was used infrequently or sporadically. *Id.* at 41, 539 S.E.2d at 269. Section 15A-2002 requires the trial court to "instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002, para. 2 (2001). We held in *Davis* that nothing in this section requires the judge to state "life imprisonment without parole" every time he alludes to or mentions the alternative sentence. *Davis,* 353 N.C. at 41, 539 S.E.2d at 269.

The trial court in the instant case stated at the beginning of its instructions to the jury, "Now, again, when I say life imprisonment I

mean life without parole," and reiterated this instruction later, say-
ing, "If you unanimously recommend a sentence of life imprisonment,
the Court will impose a sentence of life imprisonment without
parole." We hold that defendant's right to a fair sentencing proceed-
ing was not violated because the trial court's instruction met the
requirement of section 15A-2002. Defendant's argument therefore
fails.

## PRESERVATION ISSUES

Defendant raises twelve additional issues that have previously
been decided by this Court contrary to his position: (1) whether the
trial court erred by denying defendant's motions to disclose the the-
ory upon which the state sought the death penalty, to receive a bill of
particulars, and to dismiss the short-form indictment; (2) whether the
trial court erred by denying defendant's motion for individual juror
*voir dire* and for sequestration; (3) whether the trial court erred by
denying defendant's motion to strike the death penalty as unconsti-
tutional, arbitrary, and facially discriminatory; (4) whether the trial
court erred by failing to prevent the state from asking questions dur-
ing *voir dire* as to whether the death penalty is a necessary law; (5)
whether the trial court erred by instructing the jury that it could con-
sider during the penalty phase all the competent evidence submitted
in both phases; (6) whether the trial court erred by using the terms
"satisfaction" and "satisfy" to define the burden of proof on mitigat-
ing circumstances; (7) whether the trial court erred by instructing the
jury that it had a duty to recommend a sentence of death if it found
that the mitigating circumstances were insufficient to outweigh the
aggravating circumstances and that the aggravating circumstances
were sufficiently substantial to call for the death penalty; (8) whether
the trial court erred by instructing the jury that its answers to Issues
One, Three, and Four on the Issues and Recommendation as to
Punishment form must be unanimous; (9) whether the trial court
erred by using the word "may" in its instructions as to mitigating cir-
cumstances; (10) whether the trial court erred in its instructions as to
what each juror may consider with regard to the mitigating circum-
stances; (11) whether the trial court erred by denying defendant's
motion to prohibit the state from death-qualifying the jury; and (12)
whether the aggravating circumstance under section 15A-2000(e)(9)
is unconstitutionally vague and overbroad, both on its face and as
applied.

We have considered defendant's contentions on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these arguments.

## PROPORTIONALITY REVIEW

[19] Finally, we must determine: (1) whether the record supports the aggravating circumstances found by the jury; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death penalty is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. At defendant's capital sentencing proceeding, the jury found the five aggravating circumstances submitted for its consideration: (1) that defendant had a previous conviction for felonies involving the use or threat of violence, N.C.G.S. § 15A-2000(e)(3); (2) that defendant was previously adjudicated delinquent for committing an offense that would be a felony involving the use or threat of violence if committed by an adult, N.C.G.S. § 15A-2000(e)(3); (3) that the murder was committed during the commission of robbery with a dangerous weapon, N.C.G.S. § 15A-2000(e)(5); (4) that the murder was committed during the commission of first-degree kidnapping, N.C.G.S. § 15A-2000(e)(5); and (5) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

Two statutory mitigating circumstances were found by the jury: (1) that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); and (2) that defendant's capacity to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6). Of the eleven nonstatutory mitigating circumstances submitted by the trial court, one or more of the jurors found the following four to have mitigating value: (1) that at the age of thirteen, defendant was admitted to Brynn Marr Psychiatric Hospital, where he was diagnosed with a mental disorder and released after only two weeks because his insurance coverage had expired; (2) that defendant was unconditionally released from training school, back into society, suffering from a "Psychotic Thought Disorder," thereby making him a danger to himself and to others; (3) that for approximately two years between his release from training school and this

crime, defendant did not receive any treatment for his mental illness; and (4) that defendant has, and has had, a loving and protective relationship with his brothers.

Having thoroughly reviewed the record, transcripts, and briefs in the present case, we conclude that the record fully supports the aggravating circumstances found by the jury. We find no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration. Thus, we now address our final statutory duty of proportionality review.

The purpose of proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Atkins*, 349 N.C. at 114, 505 S.E.2d at 129 (quoting *Holden*, 321 N.C. at 164-65, 362 S.E.2d at 537). "In our proportionality review, we must compare the present case with other cases in which this Court has ruled upon the proportionality issue." *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994).

We have found the death penalty to be disproportionate in seven cases. *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

This conclusion is supported by several characteristics of this case. First, the jury found defendant guilty of first-degree murder under both the felony murder rule and under a theory of premeditation and deliberation. This is significant because the presence of premeditation and deliberation indicates "a more calculated and cold-blooded crime." *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Second, the jury's finding that the defendant committed the murder while engaged in the commission of another violent felony under N.C.G.S. § 15A-2000(e)(5) has been held to be sufficient, standing alone, to sustain a death sentence. *See Zuniga*, 320 N.C. at 274-75, 357 S.E.2d

at 923-24. Here, the jury twice found that this aggravating circumstance existed.

"We also compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in that pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.*; *see also State v. Gainey*, 355 N.C. 73, 116, 558 S.E.2d 463, 490 (2002) (noting that "similarity of cases is not the last word on the subject of proportionality"). Whether a sentence of death is disproportionate in a particular case "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47 (quoting *State v. Williams*, 308 N.C. 47, 81, 301 S.E.2d 335, 356, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983)). Accordingly, we conclude that this case is more similar to cases in which we have found the death penalty proportionate than to those in which we have found it disproportionate.

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentence of death was excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free from prejudicial error. Therefore, the judgment of the trial court sentencing defendant to death must be left undisturbed.

NO ERROR.